STATE, *ex rel.* CHARLES T. CATES, JR., Attorney-General *et al. v.* WEST TENNESSEE LAND COMPANY *et al.*

*(Jackson.* April Term, 1913.)

1. **NAVIGABLE WATERS. And lands underlying are not susceptible of private ownership.**
Where a body of water is navigable in the technical legal sense of that term, neither the water nor the land underlying it is susceptible of private ownership. (*Post, p.* 580.)

2. **SAME. Navigable rivers are defined.**
"Navigable rivers" are rivers which are in fact capable of being navigated, in the ordinary state of the water, ascending and descending, by vessels employed in the ordinary purposes of commerce, regardless of the mode of propulsion. (*Post, pp.* 584-586.)

Cases cited and approved: Elder v. Burrus, 6 Humph., 358; Stuart v. Clark, 2 Swan, 9.

3. **SAME. Reelfoot Lake is of sufficient depth, width, and volume to make it navigable in the strict technical legal sense.**
Reelfoot Lake was formed by an earthquake in 1810, which lowered the lands, with the timber thereon, several feet. The lake is from two to seven miles wide, and about fifteen miles long, with an average depth of about seven feet, except at two points, and at places along the greater distance of the shore lines, where the water is only a few inches deep for several yards out into the lake. At the said two points, the water is, in its ordinary stage, from a few inches to two feet in depth for a distance or width of between two hundred and three hundred yards. There are numerous pools from seven to twenty feet in depth; but they have no continuous, deep, open connection with the rest of the lake, and are surrounded by trees projecting above the water.

or in the form of submerged stumps. A basin in the northern part of the lake is about two miles long, with an average depth of ten feet, and is open and free from obstructions, but is surrounded with timber and stumps; and the lake south of such basin is from five to seven miles wide and is several miles long, and is separated from the basin by shallow water two hundred yards wide, and from a few inches to two feet in depth. There are a number of other smaller basins, practically free from stumps and timber, in the southern portion of the lake, but without open connection with each other or with the main body of water, on account of the stumps and timber. The lake has an overflow inlet and a continuous outlet with the Mississippi river, but not of sufficient depth to form a navigable connection with that river. It is *held* that such lake has sufficient capacity in depth, width, and volume of water to make it a navigable stream in the strict, technical, legal sense. (*Post, pp.* 580-588.)

4. SAME. Distinguishing difference between waters navigable in legal sense and in ordinary sense is capacity, and the legal effect upon title.

The distinguishing feature or difference between waters navigable in the technical legal sense and waters navigable in the ordinary sense is capacity in depth, width, and volume; and the legal effect of this difference is upon the title. Waters navigable in the legal sense belong to the public; but waters navigable only in the ordinary sense may be privately owned. (*Post, p.* 588.)

5. SAME. Legally navigable cannot be privately owned; ordinarily navigable owned by riparian proprietors subect to public easement.

Streams navigable in the technical legal sense and the lands covered by them cannot be privately owned; and their natural and primary uses are in the public for navigation, commerce and fishing; but where the streams are not navigable in the technical legal sense, the ownership of their beds is in the

riparian proprietors, though the public have an easement therein for the purposes of transportation and commercial intercourse. (*Post, pp.* 588, 589.)

Cases cited and approved: Stuart v. Clark, 2 Swan, 9; Shively v. Bowlby, 152 U. S., 1.

**6. SAME. Public rights in streams technically navigable.**

In addition to the right of navigation in streams technically navigable, the public have the rights of the ownership of the water and the lands thereunder, as well as fishing and hunting privileges, and everything of value incident to the right of soil. (*Post, p.* 589.)

**7. SAME. Stream of sufficient capacity in depth, width, and volume to be legally navigable is not rendered legally non-navigable by stumps and trees.**

If a body of water has sufficient capacity in depth, width, and volume to be legally navigable, it is a navigable stream, whether actually used for navigation or not; and the fact that a legally navigable stream contains stumps and trees, so as to prevent its present actual navigation, will not prevent it from being a navigable stream. (*Post, pp.* 589-596.)

Cases cited and approved: Stuart v. Clark, 2 Swan, 9; The Daniel Ball, 77 U. S. (10 Wall.), 557; The Montello, 78 U. S., 411; State v. Guano Co., 22 S. C., 50; Heyward v. Mining Co., 42 S. C., 133; Moore v. Sanborne, 2 Mich., 519; Brown v. Chadbourne, 31 Me., 9; Hickok v. Hine, 23 Ohio St., 523; Diedrich v. Railroad, 42 Wis., 248; Attorney-General v. Woods, 108 Mass., 436; Rowe v. Granite Bridge Corp., 21 Pick. (Mass.), 344; Railroad v. Brooks, 39 Ark., 403.

Case cited and overruled. Webster v. Harris, 111 Tenn., 668.

**8. ABANDONMENT. Not established by failure to take certain lands into consideration in partition suit, when.**

It could not be claimed that submerged lands were abandoned because they were not taken into consideration in a partition

127 Tenn.—37.

suit, where the fisheries therein were not then deemed valuable or used, as such lands may have been omitted from the partition because not valuable for agricultural purposes or for their timber. (*Post,* 596, 597.)

9. SAME. Not presumed from failure to include certain lands in partition, if such failure is explainable consistently with continued claim of land, when.

If the conduct of the owners of certain land in not partitioning it, when the other lands owned by them as tenants in common were partitioned, can be explained consistently with their continued claim of the land, it will not be presumed that they abandoned it by their failure to include it in the partition proceedings. (*Post, p.* 597.)

Case cited and approved: Phy v. Hatfield, 122 Tenn., 696.

10. NAVIGABLE WATERS. Owner of granted land is not deprived of title by its subsequent submergence into a navigable lake, when.

The fact that land was submerged by a legally navigable lake, created by an earthquake, after the land was granted by the State, would not deprive the owners of their title to the land, if it can be reasonably identified. (*Post, pp.* 597-599.)

Case cited and approved: McCullough v. Wall, 4 Rich. Law, 68.

11. SAME. Same. Such ownership of the submerged land entitles owner to exclusive fisheries over same; but not to prevent free movement of fish.

The title and ownership of a private individual to part of the bed of a navigable lake, under the conditions stated in the preceding headnote, carries with it the exclusive right of fishery in the in the waters over such part, though not the right of detaining the fish, or preventing their free movement through the waters. (*Post, p.* 598.)

12. SAME. Lands thereunder are not grantable by State.

The State cannot grant lands lying under a legally navigable lake; for it holds such lands and the waters of the lake in trust for all the people. (*Post, pp.* 599, 600.)

Cases cited and approved: Elder v. Burrus, 6 Hum., 358; Stuart v. Clark, 2 Swan, 9.

13. SAME. Test of navigability applies to lakes as well as streams.

The rule that all bodies of water having sufficient depth and volume for the carriage of ordinary crafts of useful commerce are navigable applies to lakes as well as to streams. (*Post, p.* 600.)

14. SAME. Common law test of navigability is not in force here; reasons for both rules.

The test of navigability of navigable streams in England, namely, the ebb and flow of the tide, and the reason underlying their rule, is not applicable to American streams, because the adoption and application of such a test would render some of the largest and most useful streams nonnavigable. (*Post, p.* 600.)

Case cited and approved: Genesee Chief v. Fitzhugh, 12 How., 443.

FROM OBION.

Appeal from Chancery Court of Obion County to the Court of Civil Appeals, and by *certiorari* from the Court of Civil Appeals to the Supreme Court.—C. P. McKINNEY, Chancellor.

ATTORNEY-GENERAL CATES, H. H. BARR and T. B. PURYEAR, for State.

V. H. HOLMES, M. H. TAYLOR and J. B. WADDELL, for Land Co.

THOMAS O. MORRIS, for Wilson.

MR. JUSTICE LANSDEN delivered the opinion of the Court.

In the view which we take of this case, it is not necessary to, make an extended statement of the pleadings, or to discuss the questions presented upon the demurrer to the bill. The only question for determination is whether Reelfoot Lake is a navigable body of water in the technical legal sense of that term. If it is, we think it is beyond dispute upon the authorities that neither the waters nor the lands underlying them are. capable of private ownership. If it is not, and is navigable only in the common or ordinary acceptation of the term, then both the waters and the lands underlying them are capable of private ownership, and belong to the defendants. This one question of the navigability of the lake is inclusive of all questions made upon the appeal, and determines the entire controversy.

The lake was formed by an earthquake in 1810. The result of the earthquake was to lower the lands upon which the waters of the lake rest several feet below the surrounding lands. The submergence of the land carried down the forest timber growing upon it, and these timbers and their remains are still in the lake. The lake is from two to seven miles wide and about fifteen miles long, with an average depth of about seven feet, except at Beaver Dam and Brewer's Bar, and at and near the shore lines. At places along the shore lines, and probably along their greater distance, the water is only a few inches deep for several yards out into the

lake. The shallow water along the shores and in the lake is filled with vegetation natural to wet lands in this climate. The water at its ordinary stage at Brewer's Bar and Beaver Dam is from a few inches to two feet in depth. These shoals are from 200 to 300 yards wide. There are numerous deep pools of water in the lake, ranging in depth from seven feet to more than twenty feet; but they have no continuous open connection with the other waters of the lake. They are surrounded by trees, which project in many instances above the water, but many of them have rotted off at the water's surface; but the stumps of the trees remain submerged in the water of the lake.

Upper Blue Basin, in the northern portion of the lake, is about two miles long, with an average width of something like 400 yards, and an average depth of probably ten feet, and is open and free of obstructions. It is surrounded, however, with timber and stumps. The part of the lake south of Upper Blue Basin is five to seven miles wide and several miles long. It is separated from Upper Blue Basin by Brewer's Bar, which makes a strip of shallow water only a few inches to two feet deep and probably 200 yards wide. There are a number of other smaller basins, practically free from stumps and timber, in the southern portion of the lake; but, like the other bodies of water, they have no open connection with each other or with the main body of water on account of the stumps and timber. Most of the snags standing in the lake are bare of limbs; but many

dead snags still stand at a height of thirty to forty feet above the surface of the water.

Some of the witnesses speak of the general appearance of the lake as that of a harbor from which the masts of vessels project. The area of the lake is probably sixty square miles and its average depth is probably seven feet, so we think it undoubtedly true that the lake contains sufficient volume of water, and is of sufficient size, to make it navigable in the legal sense, but that it is not suitable in its present condition for purposes of navigation on account of the existence of the stumps and trees which form obstructions to successful navigation. It is also true that commercial vessels would not be able to reach the shore line at many places on account of the shallowness of the water.

The lake has both an inlet and an outlet. The outlet flows continually, but is not of sufficient depth to form a navigable connection with the Mississippi river, into which it flows. At present there is a government levee opposite the northern end of the lake, which prevents the waters of the Mississippi at ordinary tide from flowing into the lake. Before this levee was built, the river would overflow into the lake once or twice a year, and thus raise its waters many feet. The surplus waters would remain in the lake until the late spring or summer following.

From 300 to 400 people take fish from the waters of the lake daily and employ in this capacity something like 1,000 small boats, canoes, and batteaux. They take

annually from 1,000,000 to 1,500,000 pounds of fish. Wild fowl are killed upon its waters every year in large quantities. Its waters are clear and pure, and as a breeding ground for fish, it is probably not excelled anywhere in the world. Before the building of the levee above mentioned the fish would have free access from the lake to the Mississippi river and from the river to the lake during high water. The public have used the lake and its fowling and fishing privileges at will for more than forty years.

The vessels of commerce plying the Ohio, Cumberland, and Caney Fork rivers range in tonnage capacity from five to 200 tons. A five-ton vessel plying the Cumberland and Caney Fork rivers is fifty-nine feet two inches long, eleven feet nine inches wide, with a hold 1.9 feet deep, and draws twelve inches of water loaded. Another vessel of eleven tons' capacity is fifty-five feet long, fourteen feet wide, two feet in the hold, and draws ten inches of water light. Steamers on the Obion and Forked Deer rivers are from sixty-five to 100 feet in length, fifteen to twenty feet in breadth, and draw from fifteen to twenty-four inches of water loaded. Steamers of the Cumberland river are 125 to 165 feet in length, and from twenty-two to twenty-nine feet beam, have from 150 to 191 tons' capacity, and draw eighteen inches light, and four feet four inches loaded. Fifty per cent. of the sailing and steam mercantile vessels of the United States are of less than twenty tons gross capacity, and not more than twenty-five per cent. exceed 100 tons gross.

. In *Elder* v. *Burrus,* 6 Hump., 358, the Cumberland river was held to be navigable in the technical legal sense. In that case, the court rejected the common-law definition of a navigable stream, and, while it forbore to lay down a definition of navigability, the Cumberland river was held to be navigable in the strict technical legal sense, according to the civil law. But in *Stuart* v. *Clark,* 2 Swan, 9, 58 Am. Dec., 49, the court laid down the definition of a navigable river which has been uniformly followed by this court ever since. The definition of such a stream according to the civil law was reaffirmed as the rule of this State, and the definition in the text of Mr. Angell on Water Courses was quoted and adopted. The quotation is as follows:

"Navigable rivers are not merely rivers in which the tide flows and reflows, but rivers capable of being navigated; that is, navigable in the common sense of the term." In the words of the Digest, a navigable river is *"statio iturre navigio."*

The learned judge, speaking for the court, observed that the only change of the common law effected by the adoption of the rule of the civil law is the substitution of a new and more appropriate criterion of a navigable river, "and that is, not the flow and reflow of the tide, but simply the fact whether the river, in the ordinary state of the water, is capable of and suited to the usual purposes of navigation. In all other respects, the principles of the common law, regulating and defining the respective rights of the public and of the riparian pro-

prietors in rivers of whatever character, remain unchanged, and are to be applied by the courts."

After stating that, under the new test of navigability of rivers, the term "navigable" is none the less a word of technical meaning than at common law, as determining the respective rights of the public and the riparian owners, in reference to the property of the soil, as well as the use of the watercourses, the court laid down the final definition of a navigable body of water in the technical legal sense of the term in its own language as follows:

"We are aware of no less exceptionable criterion than that to be extracted from some of the cases before referred to, namely, a river capable, in the ordinary state of the water, of navigation, ascending and descending, by sea vessels; that is, such vessels as are employed in the ordinary purposes of commerce, whether foreign or inland, and whether steam or sail vessels."

The stress which it is now sought to lay upon the use of the words "sea vessels," so as to limit navigable bodies of water to those which have sufficient depth and capacity to float vessels which navigate the high seas, is not justified by the language of the court in that case. The words themselves are followed by the explicit explanation that they are meant to include such vessels as are employed in the ordinary purposes of commerce, whether foreign or inland, and whether steam or sail vessels. Inland commerce is not carried on the high and therefore necessarily not carried in sea-going

vessels in the sense referred to.    The same strict and literal meaning applied to the expression "whether steam or sail vessels" would render a stream nonnavigable if its commerce was borne exclusively by vessels propelled by gasoline or electricity, without reference to the volume of its waters or the width and depth of its channel.

In no case decided by this court has such a restricted definition been given to sea vessels.    Indeed, the meaning now attributed to the terms by the learned Chief Justice would render unnavigable both the Cumberland and the Ohio rivers, and probably the Mississippi above Cairo.

We think, therefore, that it can be reasonably held that Reelfoot Lake has sufficient capacity, that is, sufficient depth and width and volume of water, so as to make it a navigable stream in the strict technical legal sense.

The next question for determination is whether the presence of the stumps and trees herein described, and which admittedly form a present obstruction to navigation, will destroy the character of the lake as a navigable body of water, so as to make it the subject of private ownership.

In *Webster* v. *Harris*, 111 Tenn., 692, 69 S. W., 782, 59 L. R. A., 324, it was held by this court that they do. The facts found by the court in that case are substantially the same as those stated in this opinion.    The test of a navigable body of water was stated to be "whether a stream is inherently in its nature capable

of being used for the purpose of commerce," and that, "in determining the natural capacity of a body of water for navigable purposes, . . . the extent to which it is used for purposes of navigation should be looked to," and it was said that this "affords the strongest evidence as to its navigability or nonnavigability in either sense." For this proposition, the court cited *Olive* v. *State,* 86 Ala., 88, 5 South., 653, 4 L. R. A., 38; Gould on Waters, sec. 43. It was also said that, in order for a body of water to be navigable, there must be some commerce and navigation upon it which is essentially valuable. *Swanson* v. *Boone Co.,* 42 Minn., 532, 44 N. W., 986, 7 L. R. A., 674, was cited in support of this proposition. It was also said that its connection or want of connection with other navigable bodies of water is a strong circumstance to be looked to in order to determine its navigability. *Willow River Club* v. *Wade,* 100 Wis., 86, 76 N. W., 273, 42 L. R. A., 305, was cited in support of this proposition.

Without undertaking to review the authorities cited in support of the decision in *Webster* v. *Harris,* we say that those of them which support the opinion do not represent the great weight of American authority, and some of them are not applicable. The Alabama court was speaking of a floatable stream. In the case of *Swanson* v. *Boone Co.* the Minnesota court was considering the right of the public to navigate the Mississippi river and the rights of certain riparian proprietors in respect thereto, and no question pertinent to the one under con-

sideration here was presented in that case.   In our opin-
ion, the test stated in *Webster* v. *Harris* does not reach
the true definition of a navigable body of water.

The chief importance of determining whether Reel-
foot Lake is navigable in the technical legal sense does
not concern its use as a public highway for commerce,
but is in regard to the respective rights of the public
and private person in the use and ownership of its wa-
ters and the lands submerged by them.   It is primarily
a question of dominion and ownership, rather than one
of commerce and travel.   The right of the public to use
its waters as a highway for commerce is precisely the
same, whether the lake be navigable in the technical
legal sense or whether it be navigable only in the com-
mon or ordinary sense.   The distinguishing difference
between the two classes of streams is capacity; that is,
depth, width, volume.   The legal effect of this difference
is upon the title, the right of soil in waters and the
lands under them, and the fisheries.   If a given body of
water falls within one class, it belongs to the public;
if in the other, it may be privately owned.

The real nature in law of navigable bodies of water
is admirably stated by the supreme court of the United
States in *Shively* v. *Bowlby*, 152 U. S., 1, 14 Sup. Ct.,
548, 38 L. Ed., 335.   The court said:

"Such waters [navigable streams] and the lands they
cover, either at all times, or at least when the tide is
in, are incapable of ordinary and private occupation,
cultivation, and improvement, and their natural and

primary uses are public in their nature, for highways of navigation and commerce, domestic and foreign, and for the purpose of fishing by all the king's subjects. Therefore the title, *jus privatum*, in such lands, as of waste and unoccupied lands, belongs to the king as the sovereign; and the dominion thereof, *jus publicum*, is vested in him as the representative of the nation and for the public benefit."

And in *Stuart* v. *Clark* this court said:

"If the river be a public navigable stream, in the legal sense, the soil covered by the water, as well as the use of the stream, belongs to the public. But if it be not navigable in the legal meaning of the term—as is the case in England as to all streams above the flow of the tide—the ownership of the bed of the stream is in the riparian proprietors, but the public have an easement therein, for the purposes of transportation and commercial intercourse." *Stuart* v. *Clark*, 2 Swan, 16, 58 Am. Dec., 49.

But the public have rights in streams which are technically navigable, other than the right of navigation, such as the ownership of the waters and the lands under them, their fisheries, hunting privileges, and everything of value incident to a right of soil; and these rights exist concurrently, and are taken all together to express the public proprietorship of public waters. And so, if a body of water have sufficient capacity to be legally navigable, this determines its title, *jus privatum*, whether it is being actually used as a highway or not; and,

having such capacity, it cannot be assumed it will never be used for navigation, because it cannot be known what time and the progress of the world may bring.

Considered in this view, the presence of stumps and trees in the water, although they may prevent present navigation, cannot affect its capacity nor change its classification from that of a navigable body of water in the legal sense to that of one navigable only in the ordinary sense. Indeed, the only interest which the public has in the latter class of streams is a right of easement of way over and through their waters and the presence of stumps and trees in the water could more properly be said to destroy its capacity for navigation in that sense than in the technical legal sense.

What we believe to be a great weight of authority is in accord with this view. In *State* v. *Pacific Guano Co.*, 22 S. C., 50, it was said that, to be navigable, a stream should have sufficient depth and width of water to float useful commerce. This case was followed approvingly in *Heyward* v. *Farmers' Mining Co.*, 42 S. C., 138, 19 S. E., 963, 20 S. E., 64, 28 L. R. A., 42, 46 Am. St. Rep., 702. In that case it was stated that the "test is navigable capacity, and not that the surroundings should be such that it may be useful for the purpose of commerce." It was further said that a stream may not be useful for commerce at one time, and yet circumstances may make it so. "There are certain navigable streams in our State," said the court, "which are very valuable on account of their phosphate deposits. If the question of their navi-

gability had come before the courts for adjudication before the phosphate rock in them was discovered, and the test laid down by the circuit judge had been applied, it would have resulted in the State being deprived of this valuable source of revenue, because they were not actually used at that time."

The court also repudiated the test of connections with other highways, and stated that such a test had only been applied in cases where the question was whether a stream was a navigable water of the United States.

*Heyward* v. *Farmers' Mining Company*, supra, is supported by what appears to us to be a very great weight of authority. *The Daniel Ball*, 77 U. S. (10 Wall.), 557, 19 L. Ed., 999; *The Montello*, 87 U. S., 430, 22 L. Ed., 391; *Moore* v. *Sanborne*, 2 Mich., 519, 59 Am. Dec., 209; *Brown* v. *Chadbourne*, 31 Me., 9, 50 Am. Dec., 646; *Hickok* v. *Hine*, 23 Ohio St., 523, 13 Am. Rep., 255; *Diedrich* v. *Northwestern Union R. Co.*, 42 Wis., 248, 24 Am. Rep., 399; *Attorney-General* v. *Woods*, 108 Mass., 436, 11 Am. Rep., 380; *Rowe* v. *Granite Bridge Corp.*, 21 Pick. (Mass.), 344; *Little Rock, M. R. & T. R. Co.* v. *Brooks*, 39 Ark., 403, 43 Am. Rep., 277, in which it is held that a river made useful for commerce by improvements is a navigable river. In *The Daniel Ball*, supra, the court stated the test of a navigable stream as follows:

"Those rivers must be regarded as public navigable rivers in law which are navigable in fact; and they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways

for commerce, over which trade and travel are or may
be conducted in the customary modes of trade and travel
on water; and they constitute navigable waters of the
United States within the meaning of the acts of con-
gress, in contradistinction from the navigable waters
of the States, when they form in their ordinary condi-
tion by themselves, or by uniting with other waters, a
continued highway over which commerce is or may be
carried on with other States or foreign countries in the
customary modes in which such commerce is conducted
by water."

In The Montello, the court held in substance that if a
river is not of itself a highway for commerce with other
States or foreign countries, or does not form such high-
way by its own connection with other waters, and is
only navigable between different places within the State,
it is not navigable water of the United States, but is
a navigable water of the State. We make the follow-
ing quotation from that case.:

"The learned judge of the court below rested his de-
cision against the navigability of the Fox river below
the De Pere rapids chiefly on the ground that there were,
before the river was improved, obstructions to an un-
broken navigation. . . . Apart from this, however,
the rule laid down by the district judge as a test of nav-
igability cannot be adopted, for it would exclude many
of the great rivers of the country, which are so inter-
rupted by rapids as to require artificial means to enable
them to be navigated without break. Indeed, there are

but few of our fresh water rivers which did **not origi-**
nally present serious obstructions to an uninterrupted
navigation.   In some cases, like the Fox river, they may
be so great while they last as to prevent the use of the
best instrumentalities for carrying on commerce; but
the vital and essential point is whether the natural nav-
igation of the river is such that it affords a channel for
useful commerce.   If this be so, the river is navigable
in fact, although its navigation may be encompassed
with difficulties by reason of natural barriers, such as
rapids and sandbars."

In *Moore* v. *Sanborne,* supra, it was said:

"In this country the public right cannot depend upon
custom, or upon general use; and we accordingly find
that in nearly all the States this rule has been extended
so as to be adapted   .   .   .   to our trade and commerce,
and to embrace all streams upon which in their natural
state there is capacity for valuable floatage, irrespective
of the fact of actual public use, or the extent of such
use.   Nor   .   .   .   can the fact that a floatable stream
has not been used by the public, or has only been used
by persons following a particular occupation, deprive
such stream of its public character.   This principle is
one of vast importance to the interests of this and all
new States."

In *Brown* v. *Chadbourne,* supra, the court said:

"If a stream could be subject to public servitude by
long use only, many large rivers in newly settled States,
and some in the interior of this State, would be alto-

gether under the control and dominion of the owners of their beds, and the community would be deprived of the use of those rivers, which nature has plainly declared to be public highways. The true test, therefore, to be applied in such cases, is whether a stream is inherently and in its nature capable of being used for the purposes of commerce, for the floating of vessels, boats, rafts, or logs."

In *Hickok* v. *Hine,* supra, the Supreme Court of Ohio said:

"A river is regarded as navigable which is capable of floating to market the products of the country through which it passes, or upon which commerce may be conducted; and, from the fact of its being so navigable, it becomes in law a public river or highway. The character of a river, as such highway, is not so much determined by the frequency of its use for that purpose as it is by its capacity of being used by the public for purposes of transportation and commerce."

Many other cases could be cited and quoted from to the same effect, but it is sufficient to say that a reference to the selected cases in the L. R. A. and the American Decisions, American State Reports, and the American and English Annotated Cases will show that, with only an occasional exception, the courts of nearly all of the American States have entertained similar views. It is not possible within the compass of a judicial opinion to comment on all of them, or to make excerpts from them, or even to cite them. We call especial attention to the

text of 29 Cyc., page 289, where the rule is stated substantially in the same language as the preceding cases, with the additional observation that this rule is not only the one which prevails in nearly all of the States in this country, but was also the rule of the civil law. Cases are cited in the notes in support of the text from the States of Alabama, Arkansas, California, Florida, Georgia, Illinois, Indiana, Iowa, Michigan, Minnesota, Wisconsin, New York, North Carolina, Ohio, Oregon, Pennsylvania, South Carolina, Vermont, West Virginia, and Wisconsin, the United States Supreme Court, and Canada.

We think the holding of the court in *Webster* v. *Harris* is not only contrary to a very great weight of authority in this country, and especially our own cases, but that it is a misconception of the purpose of the law in giving to bodies of water the two classifications of navigable in the technical legal sense, and in the common or ordinary sense. The only purpose of such classification is to establish the respective rights of the public and private individuals in the ownership and use of the waters and the lands under them. We suppose that if a great storm should blow all of the trees along the banks of the Cumberland river into and across its channel, so as to completely obstruct navigation, it would not be contended by any one that its navigable character could be affected by that event. There is no question of navigation to be determined in this case. It is no answer to say that highways do not exist in for-

ests, and that public roads cannot be conceived of where they are occupied entirely by stumps and trees, because the right to have a public road through a forest is easily conceivable, and has often existed in fact. If the owner of a large forest should subdivide it for sale, and plat out roads and streets and driveways, and dedicate them to the public, it could not be doubted that purchasers of the subdivisions would be entitled to claim a highway through the forest, although not a tree had been cut.

Inasmuch, therefore, as the lake has capacity for navigation in the technical sense, as laid down in *Stuart* v. *Clark*, supra, the rights of the public attach to it, to its use, and to its fisheries, so that it is incapable of private ownership, and the State owns it in trust for all the people, and cannot alienate it away.

What has been said with respect to the rights of the public and the defendants to the waters and the fisheries of the lake would apply equally to all of the grants of land claimed by the defendants; but at this point it should be stated that the defendants claim under grants issued by the State of North Carolina to one Doherty before the lake was formed. At this time the lands were subject to grant, and the grants issued by North Carolina were valid at the date of their issue, and the titles conveyed by them vested in Doherty, the grantee. It is said for the State that these grants were abandoned by their claimants in a partition suit instituted in Williamson county, in which the lands submerged by the lake were not taken into consideration in the division of the estate

between the tenants in common. The bare fact as stated is all that appears. This does not necessarily establish an abandonment. At that time the fisheries were not deemed to be valuable, or at all events were not being used, and it is entirely possible that the lands submerged by the waters of the lake were left out of the division of the estate of the then owner (Polk) because they were not valuable for agricultural purposes or for their timbesr, without any intention to abandon them. This would be a reasonable explanation of why they were not included in the lands divided, and if the conduct of the then owners may be explained consistently with their continued claim of the land, an abandonment will not be presumed. *Phy* v. *Hatfield,* 122 Tenn., 696, 126 S. W., 105, 135 Am. St. Rep., 888, 19 Ann. Cas., 374.

Does the fact that the Doherty grants were submerged by the lake after they were granted, and are now the bed of a navigable stream, deprive the owners of the submerged land of their title to the lands and their right to claim the fisheries in the waters lying over them? Upon this particular question, we have not been cited to any authority directly in point, and we have found none. It would seem, on principle, that the title to the land would be unaffected by the formation of the lake, and its owners would be entitled to its use and its enjoyment as long as they can reasonably identify it and fix its boundaries. It is proven in this case that the Doherty grants can still be identified, and their boundaries are reasonably well established. The waters of the lake are

clear, and many of the monuments of boundary can still be identified. Grants Nos. 51, 90, and 31 are not totally submerged, and portions of them are still upland and form parts of the shore of the lake. Grant No. 161 is entirely submerged; but its boundaries are located, and it is platted on the map. As these lands were grantable by North Carolina, and were subject to private ownership before the formation of the lake, we are of opinion that the mere fact that they have since become submerged by a body of navigable water does not deprive the owners of their title to the land as long as they can be reasonably identified. Upon all of the authorities, this title and ownership will carry with it the exclusive right of fishery in the waters over these grants. This, of course, does not include the right of detaining the fish, or preventing their free movement through the waters of the lake, and only includes the exclusive right to take fish in the waters over these grants as they may be found according to their natural inclination.

. A case strongly in point is *McCullough* v. *Wall*, 4 Rich. Law, 68, 53 Am. Dec., 715, in which the Supreme Court of South Carolina had under consideration a right of fishery in the Catawba river. Briefly stated, that was a case of trespass to try title, in which the plaintiff sought to recover a certain rock, called Julius' Rock, situated in the Catawba river and usually covered with water. It was used by the defendant as a fishing station. The plaintiff claimed the rock as a part of his tract of land which lay on the west side of the river, and mainly

Reelfoot Lake Case.

above the rock. The plaintiff's title originated in a grant dated July 7, 1772, which was described as being bounded by the "Catawba river at the great falls." It appeared that the Catawba river was not navigable at and above the rock at the date of plaintiff's grant, 1772; but between 1817 and 1830 canals were made around the shoals above the rock in question by State authority, so that the river was made navigable by means of these canals at the point where it bounded the plaintiff's tract of land. Upon these facts, the court said:

"The jury have found that the Catawba river, where it is the boundary of the land granted, was not, in 1772, the date of the grant, navigable for boats. If it has since been made navigable, the right of the public to use it as a highway has been asserted; but the right of the grantee and those claiming under him, subject to the rights which the public have in the river as a highway or easement, continues to the soil granted *ad filum aquae,* as it vested at the grant. A subsequent improvement of the river, or change of the law relating to the soil of rivers, could not divest the rights of soil which had been granted, further than was required for some public purpose."

The foregoing authority, however, has no application to grants claimed by the defendant to other portions of the lake, which were issued after the lake was formed. This portion of the lake is governed by the rule stated in *Elder* v. *Burrus* and *Stuart* v. *Clark,* supra, and was not grantable. The State not having parted with its

title to the land before the lake was formed, it thereafter held the waters of the lake and the lands under them in trust for all the people, and could not grant them away. This is not disputed by counsel for either party as we understand their contentions, assuming that the lake is navigable in the technical legal sense; but the opinion is advanced by the learned chief justice that inasmuch as the title to lakes was in the riparian or littoral proprietors at common law, this rule is still in force in this State, and the title to this body of water should be controlled by the common law. We think this contention is unsound, for the reason that the test of navigability at common law was the flow and reflow of the tide, and for that reason alone inland lakes were nonnavigable, without regard to their depth or their size. This test of navigability is not in force in this State, either as to streams or lakes. This is shown in the very able opinion of Mr. Chief Justice Taney in *Genesee Chief* v. *Fitzhugh,* 12 How., 443, 13 L. Ed., 1058. In England, all nontidal lakes were subject to private ownership, and they were so privately owned because they were nontidal. In this State, all bodies of water which have sufficient depth and volume for the carriage of the ordinary craft of useful commerce are navigable. Under the test adopted in *Stuart* v. *Clark,* supra, no reason exists why a distinction should be made between a lake and a stream. The authorities, both English and American, have adopted such definition of navigable waters as best subserves the uses and interests of the coun-

tries in which it is applied, having in view the nature of their streams, and the extent of their commerce, as well as the needs of the people. The ebb and flow of the tide was adopted in England, because their streams are all short, and but few of them, if any, are navigable in fact above the ebb and flow of the tide. This was a convenient and useful test of navigability. That test, however, was held not to be in force in this State, as well as the great majority of the American States, for the reason that it would deprive the public of the title to and use of some of the largest and most useful streams on the continent. It was to serve the interest of the people that the common-law definition of navigability was abandoned and held not to apply to this State. The same reason and the same public interest requires that the common-law definition of lakes be held not to be in force here.

For the reasons stated, it is our opinion that the complainant is entitled to a decree establishing its title in trust for all the people to all that portion of the lake, its fisheries and fowling privileges, lying outside of, and not over and above, the grants issued by the State of North Carolina to Doherty. As to those grants, the bill will be dismissed. The costs of the case will be equally divided.

Mr. Chief Justice Neil delivered a dissenting opinion as follows:

The bill in this case was filed by the State to remove as a cloud from its title the claim of title and ownership held by the defendant. The chancellor sustained

a demurrer to certain parts of the bill, and subsequently dismissed the whole bill, upon the bill, answer, and proof in the cause. From this decree the State appealed to the court of civil appeals, and in that court the decree of the chancellor was affirmed. The case was then brought to this court on the writ of *certiorari*, and is now before us on errors assigned here.

I shall not take up the errors in the form in which they are assigned, but shall merely respond to the questions raised.

1. As to the Doherty grants: It appears from the bill that the defendants claim title to a large part of the lake under these grants, and that they were issued by the State of North Carolina in 1788, which was before the territory now covered by Reelfoot Lake was ceded to the United States, and before the State of Tennessee was created, or became a body politic. It also appears from the bill that Reelfoot Lake was not formed until the winter of 1811-1812, and was then formed by an earthquake or series of earthquakes, which caused the land to sink and to fill with water.

The parts of the bill to which the demurrers were directed, which the chancellor sustained, contained the following allegations, viz.: "That said Doherty grants were never in fact surveyed, as required by law;" that "for more than seventy-five years Doherty and those claiming under him, not only set up no claim to said land, but paid no taxes thereon, and abandoned the same;" "that said lake is a public body of water; that it

is both navigable in law and in fact, so that it belongs to your orator in trust for all the people of the State."

The ground of demurrer directed to the charge of the bill respecting the absence of a survey was properly sustained by the chancellor. Upon the issuance of a grant, all of the prerequisites must be presumed to have taken place. *Overton's Lessee* v. *Campbell & Lackey,* 5 Hayw., 188-189, 9 Am. Dec., 780; *Callaway* v. *Sanford,* 35 S. W., 775; *Stockard* y. *McGary,* 120 Tenn., 180, 109 S. W., 507.

As to the point that the grants were abandoned, there is no charge of any fact in the bill, except as quoted that those claiming under Doherty, "not only set up no claim to said land but paid no taxes thereon," for more than seventy-five years. That an abandonment cannot be predicated upon such facts is fully shown in *Phy* v. *Hatfield,* 122 Tenn., 696, 126 S. W., 105, 135 Am. St. Rep., 888, 19 Ann. Cas., 374. It is shown in that case that a perfected title cannot be abandoned, and that certainly the failure to pay taxes would not be evidence of such abandonment. Moreover, we may add that, if the rule claimed in the bill had any existence in fact, many hundreds of thousands of acres of land in this State owned in the mountains by nonresidents would long since have been forfeited to the State. On the contrary, this court has without exception enforced such claims when they were otherwise sound, although taxes had not been paid and the owners had paid no attention to the lands for a long series of years. The demur-

rer directed to this part of the bill was therefore properly sustained by the chancellor.

The chancellor also rightly sustained the demurrer to that part of the bill which asserted in behalf of complainant any rights in the property covered by the Doherty grants on the ground that the lake is a body of water navigable both in law and fact, and belongs to the State in trust for the benefit of all its people. The ground of the demurrer was that the bill shows on its face that these Doherty grants were issued long before Reelfoot Lake was formed, and those under whom defendant claims had thus acquired title thereto before the creation of the lake.

It seems to require no argument to sustain the validity of the demurrer. The State of Tennessee never had title at any time to the lands covered by the Doherty grants; defendants deriving their title from the State of North Carolina, before the State of Tennessee came into existence. I know of no law by which the happening of an earthquake can immediately transfer title from one person to another, or by which title can be deraigned from an earthquake. Of course, the earthquake could have no effect on the title. The land was still there. It was not destroyed. It was simply lowered a few feet beyond its former level, and covered with water, and can be identified by the lines of the grant. The fact that land is covered by water does not preclude private ownership therein. The rule is recognized in numerous cases in this State, and everywhere else, that land covered by

a stream which is not "navigable in law" is subject to private ownership. So the mere fact of land being covered by water is no impediment to ownership. It is true that, if the stream which covers the land is one which at the time falls within the description of water navigable in law, it is not subject to grant by the State, and the bill in the present case does charge that the lake is a body of water navigable both in law and fact, and for the purposes of the present discussion that fact must be taken as true. But title cannot be changed by the submergence of land through the agency even of a body of water navigable in law. Submergence does not give title. The land remains the property of the original owner nevertheless.

It was suggested in the argument at the bar that the happening of the earthquake and the consequent lowering of the surface of the land, and the subsequent covering of the bed thus formed by the inflowing of water, would have the same effect as an avulsion. I do not think that the law of avulsion could be applied to such a situation. An avulsion occurs when a river suddenly and violently changes its bed and makes for itself a new channel. The subject is illustrated and discussed at length in *State* v. *Pulp Co.,* 119 Tenn., at pages 102 to 109, inclusive, 104 S. W., 437. It also seems to apply to a case where the sea violently takes land from the shore. It is difficult to see—indeed, impossible as it seems to me—how such instances could be applied to the action of an earthquake in making a lake in the

manner already stated. But let us suppose that the principle is the same; still an avulsion does not change title. This clearly appears from the authorities quoted on pages 102 and 103 of 119 Tenn., 104 S. W., 451, in *State* v. *Pulp Co.* We quote as follows, using a quotation made in the case last mentioned drawn from Harg. Law Tracts, 15:

" 'If a subject hath land adjoining the sea, and the violence of the sea swallows it up, but so that yet there be reasonable marks to continue the notice of it, or though the marks be defaced, yet if by situation and extent of quality and bounding upon the firm land the same can be known, though the sea leave the land again, or it be regained by art or industry, the subject doth not lose his property; and accordingly it was held by Cooke and Foster, M., 7 Jac. C. B., though the inundation continue for forty years. If the marks remain or continue, or extent can reasonably be certain, the case is clear, Id., 15.'

"The case of the *Town of Shinbridge,* in 18 Hen., III, is stated on page 16: 'The river Severn had gained upon the town of Shinbridge so much that its channel ran over part of the Shinbridge lands, and lost part thereof unto the other side (Aure), and then threw it back to Shinbridge. It shall not belong to Aure, neither was it at all claimed by the king, though Severn be in that place an arm of the sea; but it was restored to Shinbridge as before. The propriety of the soil was not lost to the owners who had it before.'

" 'The soil under the water must needs be of the same propriety as it is when it was covered with the water. If the soil of the sea while it is covered with water be the king's, it cannot become the subject's because the water has left it. But when the land, as it stood covered with water, did by particular usage or prescription belong to a subject, then *recessus maris,* so far as the subject's particular interest went while it was covered with water, so far the *recessus maris, vel brachii ejusdem* belongs to the same subject.' Id., 31."

To the same effect is the following:

"Where considerable quantities of soil are, by a sudden action of the water, taken from the land of one, this is called avulsion; but the ownership is not lost, though the surface earth is transported elsewhere; and it may be reclaimed, and the ownership reasserted. Thus, lands dedicated and accepted, subject to the trust impressed on them or remaining forever unoccupied by buildings, included all the land between the west line of Michigan avenue and the shore of Lake Michigan as it was when such lands were platted; and the title to such portion thereof as was subsequently carried away and submerged by the waters of the lake, and thereafter reclaimed by artificial means, was not lost, but by such reclamation thereof the city completely reasserted its title thereto as such title stood at the time of such dedication. *City of Chicago* v. *Ward,* 169 Ill., 392, 48 N. E., 927, 932, 38 L. R. A., 849, 61 Am. St. Rep., 185." 1 Words and Phrases, 655, 656.

Certainly a bill to remove as a cloud the title claimed by one whose land had become thus submerged could not be entertained, as no transfer of title can be made by an avulsion, any more than it can be made by an earthquake.

From what has been said, I think there can be no doubt that the Doherty grants must be treated as having been finally and correctly disposed of in the disposition made of the demurrer, and that in no event can complainant have any relief in respect thereof. However, I shall presently treat the case as if no demurrer had been filed on this subject, and, viewing the Doherty grants as simply a constituent part of the whole bed of the lake, and the lake as a single entity, shall cite another principle equally as conclusive as to the whole lake.

But before going to this subject it is necessary to refer to a demurrer filed to certain parts of the bill attacking the Caldwell grants, which cover the rest of the bed of the lake.

2. This demurrer was to so much of the bill as charged in substance that these grants were void because entered by Caldwell when he was deputy entry taker. The bill did not allege that Caldwell actually made the entries himself, or negative the fact that the entry taker himself was present and sanctioned such entry, or that the entry was made under the direction of such principal entry taker. Of course, the mere fact that the entries were made while Caldwell was deputy entry taker would not vitiate them. Besides, the statute does

not in terms apply to a deputy entry taker, but only to the entry taker himself; that is, the statute making entries void when made by the entry taker. *Berry* v *Waggoner,* 13 Lea, 591. That case holds also that an entry taker is competent to make an entry for his deputy, and that an entry made by the deputy in his own name, but under the direction of the principal, would not be void, but only voidable at the instance of another enterer before grant, and not by an enterer and grantee subsequent to the grant. But even if the act referred to could be held to include the deputy entry taker, I add further, and as conclusive of the whole matter, that, by chapter 175 of the Acts of 1857-58, which was several years after the Caldwell grants were issued, it is provided: "That all entries of lands made by any of the entry takers, south and west of the congressional reservation [line] be and the same are hereby legalized and made valid." But it is objected by the State that this statute does not specifically mention entries made by the deputy entry taker. Such an entry would be within the reason and spirit of the act, and would be covered by it. *Knox* v. *Emerson,* 123 Tenn., 409, 415, 131 S. W., 972; *Wright* v. *Cunningham,* 115 Tenn., 445, 91 S. W. 293.

8. I shall now recall the well-recognized general division of waters into, firstly, those which are navigable in law; secondly, those which are navigable in fact; thirdly, those which are merely floatable streams. We have a body of law upon this subject embraced in *Elder*

v. *Burrus*, 6 Humph., 358; *Stuart* v. *Clark's Lessee*, 2 Swan, 9, 58 Am. Dec., 49; *Sigler* v. *State*, 7 Baxt., 493; *Holbert* v. *Edens*, 5 Lea, 204, 40 Am. Rep., 26; *Goodwin* v. *Thompson*, 15 Lea, 209, 54 Am. Rep., 410; *Railroad* v. *Ferguson*, 105 Tenn., 552, 59 S. W., 343. 80 Am. St. Rep., 908; *Webster* v. *Harris*, 111 Tenn., 668, 69 S. W., 782, 59 L. R. A., 324; *Miller* v. *State*, 124 Tenn., 293, 137 S. W., 760, 35 L. R. A. (N. S.), 407, Ann. Cas., 1912D, 1086, to which I think little need be added. These cases, when taken all together, clearly and accurately define the three classes so that they may be recognized.

I pause at this point to emphasize the importance of ascertaining and stating clearly the rules on this subject which have been formulated by this court, and of adhering to them, and the danger of changing or modifying them at this late day. The importance of the matter consists in the fact that they are primarily and chiefly rules of property which determine the ownership of the land constituting the bed of every stream in the State, and hence are the foundations of many thousands of titles.

Here it is necessary to discuss the cases above cited, and refer to certain underlying principles.

A most noteworthy fact is that the question of navigability is always raised in the class of cases we have before us for the purpose of determining the susceptibility to private ownership of the land on which the waters rest or over which they flow, or as incident to such asserted ownership, the uses of the watercourses,

or the right to the taking of fish therein. When this fundamental purpose of the inquiry is kept in mind, much of the uncertainty and difficulty of the subject will disappear.

The real inquiry then is, always, whether the land under such and such water can be the subject of private ownership. Under the common law it was held that land underlying streams or rivers was subject to private ownership, except that lying under streams wherein the tide ebbed and flowed. Such streams, so far as the influence of the tide extended, were said to be navigable in law, of which fact, of course, the court could take judicial notice. This court in *Elder* v. *Burrus,* supra, held the common-law rule inapplicable to this State, since we had no tidal rivers, and adopted the rule of the civil law instead, which left the question of navigability open to proof in each case.

In that case the contest was over an alleged shortage in land sold by the acre lying on Cumberland river. "It was agreed," says the statement of facts preceding the opinion, "that the Cumberland was a navigable river, a great highway, and the chief outlet and inlet of commerce for the middle part of Tennessee, and also that it was not a tide water." The trial judge charged: "That when a deed called for running to Cumberland river, thence up the river, the location of the line should be at the center of the river and not at low-water mark." The correctness of this charge was the matter up for determination. It was conceded by the court that un-

der the common law this would have been a correct charge as to land lying on any river above tide water; but it was held that the tide-water criterion was not the proper one to use in this State for the purpose of determining what streams are navigable in law, since Tennessee has no such streams.    The reasons were elaborated as follows:

"The insular position of Great Britain, the short courses of her rivers, and the well-known fact that there are none of them navigable above tide water but for very small craft, well warrants the distinction there drawn by the common law.    But very different is the situation of the continental powers of Europe in this particular.    Their streams are many of them large and long, and navigable to a great extent above tide water, and accordingly we find that the civil law, which regulates and governs those countries, has adopted a very different rule as to what are or are not navigable streams, and by it all rivers, even above tide water, provided they are navigable for ships or boats, are considered as public property.

"Now, these principles of the common [and] civil law are not in conflict with one another; they are both right and proper for the countries to which they are made to apply.    In England there are no streams navigable above tide water; but the reverse is true of the Continent, and the end designed to be effected, both by the common and civil law upon this subject, is identical, viz.:   That navigable rivers shall not become pri-

vate property, but shall belong to the community at large. If the local situation of the Continent of Europe required an extension of the construction of what was necessary to constitute a navigable river, and prevented its restriction to tide water, much more so does that of our own country, and particularly the valley of the Mississippi. Our rivers are of immense extent and size, and navigable for thousands of miles above their mouths. So, to adopt the English principle that no river is a navigable river above the ebb and flow of the tide would be to declare that there is no river navigable in the valley of the Mississippi, and that the Mississippi, Missouri, Ohio, and Tennessee do not belong to the public, but are the property of individual owners of land upon their margins—an absurdity too monstrous to be thought of. Shall it be held that the interest of the community of England requires that their navigable streams should belong to the crown as public property, but that in all the States bordering on the Mississippi and its mighty tributaries, these great and important highways, by which such an amount of merchandise of every kind and description is annually sent to market, shall belong to private individuals because the tide does not ebb and flow in them? Surely not, unless we are compelled by positive law so to maintain.

"Upon what principle can it be contended that the rule of the common law of England, as to what makes a navigable river, is obligatory in the State of Tennessee? I trust I have shown satisfactorily that it is one not adapted to our position."

It is perceived that the court did not undertake a definition of what would constitute a navigable stream (that is, one navigable in law) under the rule of the civil law. The view of the court on this question can only be inferred from the reference made to the great rivers, Mississippi, Missouri, Ohio, and Tennessee. and the previous expression: "We find that the civil law which regulates and governs those countries has adopted a very different rule [from the rule of the common law] as to what are or are not navigable streams, *and by it all rivers,* even above tide water, provided they are *navigable for ships or boats,* are considered as public property"—and the expression: "Our rivers are of immense extent and size, and navigable for thousands of miles above their mouths."

The next case, *Stuart* v. *Clark's Lessee,* supra, is, I think, our leading case on this subject, the opinion in which was written by one of our greatest and most accurate judges. The contest in this case was over the ownership of an island in Nolachucky river. If the river was one navigable in law, the grant which called to begin at the bank of the river, running thence various courses and distances to a stake on the bank of the river, at a different point, then up the different meanders of the river to the place of beginning, would run only to the margin of the river, and would not take in the island; on the other hand, if the river was not one navigable in law, the grant would run to the center of the stream and take in the island. In order to settle the question it became necessary, therefore, for the court,

to establish a criterion for determining when a river is navigable in law and when not so navigable. After referring to the principles settled in *Elder* v. *Burrus,* and to certain cases in Pennsylvania, North Carolina, and South Carolina, the court proceeded to a discussion of the question. Before reproducing that discussion, I think that a reference to what was said concerning the North Carolina and South Carolina decisions will enable the court's views to be better understood. It was said that it was settled in North Carolina that the ebbing and flowing of the tide was not the sole test of a navigable river; "that if a river be deep enough for sea vessels to navigate to and from the ocean, it is a navigable stream, and the boundary of the adjacent land is not the thread or middle of the channel. *Wilson* v. *Forbes,* 2 Dev. (13 N. C.), 30; *Ingram* v. *Threadgill,* 3 Dev. (14 N. C.), 59. In *Collins* v. *Benbury,* 3 Ired. (25 N. C.), 277, 38 Am. Dec., 722, the court said a navigable stream existed when the waters were sufficient in fact to afford a common passage for people in sea vessels. The same general doctrine has been held in South Carolina. *Cates' Ex'rs* v. *Wadlington,* 1 McCord, 580, 10 Am. Dec., 699." The court then proceeded:

"It is to be remarked that the only change of the common law, effected by the adoption of the rule of the civil law with us, is the substitution of a new and more appropriate criterion of a navigable river; and that is, not the flow and reflow of the tide, but simply the fact whether the river, in the ordinary state of the water,

is capable of and suited to the usual purposes of navigation. In all other respects, the principles of the common law, regulating and defining the respective rights of the public and of the riparian proprietors in rivers of whatever character, remain unchanged, and are to be applied by our courts.

"But it is to be borne in mind that, although we have adopted a new test of the navigableness of rivers, different from that of the common law, still, the term 'navigable,' as applied to streams, is no less a word of technical meaning than at common law; and the distinction between the technical sense of the term and its common acceptation is important to be kept in view, in enquiring into the respective rights of the public and the riparian owners, in reference to the property in the soil, as well as in the us of watercourses.

"We feel the difficulty of the attempt, under the rule of the civil law, to define with exact precision what is a navigable river, in the legal sense of the term. We are aware of a no less exceptionable criterion than that to be extracted from some of the cases before referred to, namely *a river capable, in the ordinary state of the water, of navigation, ascending and descending, by sea vessels; that is, such vessels as are employed in the ordinary purposes of commerce, whether foreign or inland, and whether steam or sail vessels.*"

The court then proceeds to state the importance of having a clear rule distinguishing streams navigable in law from those navigable in fact, and from mere floatable streams, the definition of each of the two latter,

and the rights of the public and of riparian owners in each and all in the following language, equally admirable for brevity, clearness, and force, viz.:

"The only view in which it becomes a matter of any great practical importance to distinguish between rivers that are navigable in the technical sense, and those that are not so, is in reference to the rights of the public and the adjacent owners in respect to the ownership of the bed of the stream; for, so far as regards the use of the stream, for all purposes of navigation, the public have the same right, whether it be navigable or not navigable.

"If the river be a public navigable stream, in the legal sense, the soil covered by the water, as well as the use of the stream, belongs to the public. But if it be not navigable in the legal meaning of the term—as is the case in England as to all streams above the flow of the tide—the ownership of the beds of the stream is in the riparian proprietors, but the public have an easement therein, for the purposes of transportation and commercial intercourse. A *distinction* is taken by the common law *between streams which, in the common acceptation of the term, are suited to some purposes of navigation, and small shallow streams which are not so.* In respect of *the former*—which, though not navigable in the sense of the law, are yet *of sufficient depth, naturally, for valuable floatage, as for rafts, flatboats, and perhaps small vessels of lighter draft than ordinary*—while it is settled that the right of property in the bed of the stream is vested in the riparian proprietor, and in that respect it is to be regarded as a private river, still it is equally

well settled that the public have a right to the free and
uninterrupted use and enjoyment of such stream for
all the purposes of transportation and navigation to
which it is naturally adapted. And this easement, or
'servitude of public interest,' in the phrase of the Ro-
man law, is as absolute and unlimited in the public in
reference to this class of rivers as to rivers navigable
in the technical meaning of the term.

"But as to *shallow streams, unfit for such purposes of
transportation and commerce,* both the right of prop-
erty and use are wholly and absolutely in the owner of
the adjoining land."

The words which we have italicized show the defini-
tions made by the opinion of the court. It is apparent
that under this case the test of a river navigable in
law, the bed of which cannot be granted to a private
person, is that it is one the waters of which in their
ordinary state are capable of being ascended and de-
scended by sea-going vessels, such as are employed in
the ordinary purposes of commerce, whether foreign or
inland, and whether steam or sail vessels; and the defi-
nition of a stream navigable in fact, but not in law, and
one therefore in the bed of which private persons may
have a property right, is one of sufficient depth, natu-
rally, for valuable floatage, as for rafts, flatboats, and
perhaps small vessels of lighter draft than ordinary.

Our subsequent cases are practically but commenta-
ries and applications of the principles laid down in this
great case, with one or two exceptions, presently to be
noted.

In *Sigler* v. *State,* supra, the question arose under an indictment against Sigler for cutting down trees and obstructing the navigation of Big creek, in Shelby county. The facts agreed upon were as follows: That Big creek was about fifty miles in length, commencing in Tipton county and running into Shelby county, until it emptied into Loosahatchie river, which emptied into Wolfe river, the latter emptying into the Mississippi river at Memphis; that it was about seventy feet from bank to bank, and that the banks were high and steep; that it was not navigable for boats of any size or tonnage, of its own proper waters, but that for fifteen years next preceding the date of the indictment logs and timber had been run out from rises in the water proper to said stream, by reason of rains and the rise from its headwaters; that these rises occurred several times during each year, when logs were run out for eight or ten miles above the mouth of the creek by raftsmen; that whenever the Mississippi river was above its ordinary stage of water it forced back the waters of the Wolfe and Loosahatchie rivers, and their waters were forced back into Big creek, and raised the stream to such an extent that there was a depth of channel of from ten to fifteen feet, and small boats could and did navigate the waters of Big creek during such times as the Mississippi was in such high state; and that Big creek was so raised during each year from one to three months at a time, and from one to three times during the year; that when the creek was so raised tugboats, wood-boats, **and other small craft ran up and down the creek for**

from seven to ten miles above its mouth, and by this means persons living along the banks and the public generally had a water communication with Memphis; and that by this means during each year for the fifteen years mentioned large quantities of timber, logs, rafts, and cordwood had been transported to Memphis.

It was further agreed that, about seven miles above the mouth of Big creek, five trees had been cut down into the stream in the presence of Sigler and with his consent, that the navigation was thereby obstructed below the points to which small boats had gone, and from which timber, wood, and rafts had been brought out.

It was further agreed that Sigler was owner of the land on both banks of the stream.

The court referred with approval to the definition contained in *Stuart v. Clark,* supra, of a river navigable in law, and then proceeded:

"This is a technical definition of navigable rivers, and upon this definition the rights of riparian owners are to be tested. If the river be technically navigable, the soil covered by the water, as well as the use of the stream, belongs to the public. But if the stream be not navigable, in the legal sense, the ownership of the bed of the stream is in the riparian proprietors; but still the public have an easement therein, for the purposes of transportation and commercial intercourse. And this easement, or 'servitude of public interest,' in the phrase of the Roman law, is as absolute and unlimited in the public, in reference to this class of rivers, as to rivers navigable in the technical meaning of the term.

"In Angell on Highways, 45, it is said: 'The ebb and flow is not the only test, nor' is the public easement always formed upon usage or custom. The test is whether there is in the stream capacity for use for the purpose of transportation valuable to the public; and in this view it is not necessary that the stream should have a capacity for floatage at all seasons of the year, nor that it should be available for use against the current as well as with it. If, in its natural state and with its ordinary volume of water, either constantly or at regularly recurring seasons, it has such capacity that it is valuable to the public, it is sufficient.'"

The court then continued: "According to the facts agreed on, it appears that for several months of each year Big creek is well adapted to floating out timber rafts and logs, and when the Mississippi is above its ordinary height that tugs and small boats can run up and down the stream, and that for a period of at least fifteen years, and probably more, the stream has been so used by the public. Upon these facts the judge held that Big creek was a navigable stream, and that defendant was guilty of a nuisance in obstructing it. We are of the opinion that his conclusion is sustained by the facts and the law, and we affirm his judgment."

So it does not clearly appear whether the court held Sigler liable on the ground that the stream was navigable in law or navigable only in fact, since both kinds of streams are referred to, and he would have been guilty of a nuisance in obstructing either. Evidently, however, the decision was based on the quotation taken

from Angell on Highways, and that clearly had reference, not to a stream navigable in law, but to one navigable in fact; and that quotation was applied in this sense in our most recent case, *Miller* v. *State,* supra, at page 304, of 124 Tenn., 137 S. W., 760, 35 L. R. A. (N. S.), 407, Ann. Cas., 1912D, 1086. The court, in the *Sigler Case,* cannot be understood as holding that a stream of water containing the characteristics of Big creek was navigable in law. Such a holding would be directly in the teeth of *Stuart* v. *Clark,* supra, which the opinion approved, and did not attempt to distinguish. The case, however, may be regarded as a construction of the word "naturally," in the definition given of streams navigable in fact but not in law, so as to include, within the latter, streams which by recurrent rises at certain periods of the years for a reasonable length of time become able to bear such vehicles of commerce as are described in the statement of facts set out in the case.

This is made clear and certain by the case of *Holbert* v. *Edens,* supra. That was a case where the question arose on a shortage of land. The shortage was made good if the land lying in the bed of Powell's river could be taken into account, and the question was whether that river was one navigable in law. It was agreed by the parties that Powell's river was a small river, unsuited for the navigation of steamboats or sea vessels, and was never used for such purpose, but that the same was navigable for floating flatboats and rafts down stream during freshets and high water, though not dur-

ing an ordinary stage of water; that during the summer and fall months the stream could rarely ever be used for flatboating or rafting, but that during the winter and spring months there were frequent tides sufficient for such purposes, as is usual in the rivers of East Tennessee. The court said:

"If a watercourse be navigable in the legal sense, the soil covered by the water, as well as the use of the stream, belongs to the public. If it be navigable only in the ordinary sense, the ownership of the bed of the stream is in the riparian proprietors, and the public have an easement therein for purposes of transportation and commercial intercourse. If the stream be so shallow as to be unfit for such purposes of transportation and commerce, both the right of property and use are in the owners of the adjoining land. A stream is navigable in the legal sense when it is capable, in the ordinary stage of the water, of being navigated, both ascending and descending, by such vessels as are usually employed for purposes of commerce. A river not navigable in a legal sense, may yet be navigable in the common acceptation of the term, as where, in certain stages of the water, it may have sufficient depth for flatboats, rafts, or small vessels of light draft. *Elder* v. *Burrus*, 6 Humph., 358; *Stuart* v. *Clark*, 2 Swan, 10. 58 Am. Dec., 49; *Sigler* v. *State*, 7 Baxt., 493. The agreed state of facts in this case shows that Powell's river is not navigable in a legal sense, but is navigable in the common acceptation of the term. The ownership of the bed of the stream is therefore in the riparian proprietors."

In *Goodwin* v. *Thompson*, supra, wherein a contest arose over the right asserted to take sand from the bed of French Broad river and Holston river in Knox county, this State, the plaintiff claimed under a grant from the State of Tennessee, which covered the bed and banks of both rivers; the defendant under a North Carolina grant, which called for the banks of both rivers at their junction. The court said: "The agreed facts show that both rivers are navigable in a legal sense above and below the lands covered by the grant." The court referred to and approved *Elder* v. *Burrus*, supra; and *Stuart* v. *Clark*, supra, and held in accordance therewith that neither party could hold a proprietary interest in the bed of the rivers referred to. There is considerable discussion in the opinion, but nothing is said which had not been already held in prior cases.

In *Railroad* v. *Ferguson* the question arose in relation to a bridge which the railroad company maintained over Hiwassee river. "The defendant in error," said the court, "was the owner of a steamboat built for the purpose of, and used by him in, plying the Hiwassee river when there was sufficient depth of water. In his declaration filed in this cause it is averred that plaintiff in error maintained a bridge over this stream so low as greatly to interfere with its navigation, and that by reason of such improper construction his steamboat was 'wrongfully, unlawfully, and unjustly prevented from navigating said stream and from reaching its destination in time, to his great and special damage and injury.' For the loss sustained in this alleged unlawful deten-

tion this action was brought." After stating the issues in the cause, the facts connected with the bridge, its height, etc., and the course of the case in the court below, the opinion proceeds:

"It also appears 'that in the spring season and winter, when there is good tide in the river, a light-draught steamboat now and then runs up the river to the mouth of the Ocoee river, in Polk county, Tenn.; some fifteen or twenty miles by river above Charleston,' and that at high tide such a boat can run up to a point some twenty-five or thirty miles above Charleston.

"The case was tried upon this agreed statement of facts, and evidence of the additional fact that at a certain period within three years before the institution of this suit, when the river was swollen to a considerable, but not unprecedented, degree by a heavy rainfall, the steamboat of the defendant [in error] was detained while transporting a cargo of valuable freight, by the obstruction of this bridge, to the loss of its owner.

"On this record, it is clear that the Hiwassee was a navigable river within the definition of such a stream, as frequently repeated by this court. *Elder* v. *Burrus*, 6 Humph., 367; *Stuart* v. *Clark,* 2 Swan, 9, 58 Am. Dec., 49; *Sigler* v. *State,* 7 Baxt., 493."

There was no claim on either side to any rights in the bed of the stream, but only a question as to the obstruction of one of the water highways of the State, and hence there was no necessity for distinguishing between a river navigable in law, or one simply navigable in

127 Tenn.—40.

fact, inasmuch as it is equally unlawful to obstruct passage over either; but under the facts stated it is clear, in the light of the authorities I have already examined and referred to, that the Hiwassee river is not a river navigable in law, but only in fact; that is to say, the facts stated show that it has not the characteristics of a river navigable in law. The court held that the railway company had no right to obstruct this highway, and correctly, because, as already stated, it was one of the water highways of the State, although only of the second class, and could not lawfully be obstructed, any more than a water highway of the first class.

In *Webster* v. *Harris*, supra, the definitions which we have quoted from *Stuart* v. *Clark's Lessee*, supra, were quoted and distinctly approved. I shall have occasion to refer to this case later in another connection.

In *Miller* v. *State*, supra, *Stuart* v. *Clark's Lessee*, supra, was again referred to and approved, and *Webster* v. *Harris* was also approved.

The facts in this case were, as stated by the court: "Wolfe river is a narrow, crooked, rocky, and swift stream, something over fifty miles in length. In its ordinary condition, and with the exception of a few days each year, when swollen by heavy rains, it is for the most part shallow, having numerous shoals, where it is ofttimes less than eight inches deep, and cannot in the ordinary state of its waters be navigated or used for floatage, ascending or descending, for commercial purposes. During the winter and spring months, as a result of heavy and continuous rains for six or more

hours, it has tides or floods lasting from twelve to thirty-six hours, during which small rafts containing twenty-five or fifty logs can be floated from points some forty miles above its mouth. There are usually about six of these tides each year, and they can be relied upon to occur periodically with reasonable certainty. There is a large amount of valuable timber on or near this river, which can only reach the market by being floated down it in rafts upon these tides, and it has been used for this purpose for over thirty years; there now being floated down its waters each year from $50,000 to $75,000 worth of logs in rafts of the size mentioned. . . . There is only one instance of a flatboat or barge being floated down the river, and this occurred many years ago. The preponderance of evidence clearly shows that the stream can only be used profitably for commercial purposes for floating loose logs and small rafts at regularly recurrent periods, some six times each year, each period lasting from twelve to thirty-six hours, depending upon the quantity and duration of the fall of rain."

After stating that the plaintiff in error owned a valuable tract of land situated on both sides of the river; that he was the owner of a mill located on the river, and used its waters by means of a dam which he and his predecessors in title had maintained for more than sixty years; that a slope had been constructed, composed of timbers resting upon the dam at one end, and in the bed of the river at the other, for the waters to flow over, of sufficient width to accommodate rafts; that this

slope furnished a reasonably safe and convenient means by which rafts might be floated over the dam during tides in the river; that arranged in this way the dam was not a much greater obstruction to floating rafts down the stream than existed from natural causes in other places; and that Miller had been indicted for obstructing a water highway of the State—the court, referring to the facts, then proceeded:

"The questions to be determined upon these facts are whether or not Wolfe river is a navigable stream, as averred in the first count of the indictment; and, if not, whether it is a highway for transportation of commerce which the public has a right to have kept open and unobstructed for its use in floating logs and rafts."

After referring, with approval, to *Stuart* v. *Clark's Lessee,* supra, *Holbert* v. *Eden,* supra, and *Webster* v. *Harris,* supra, as to the characteristics of a stream navigable in law, the court said:

"Wolfe river does not come within these definitions of a navigable stream. It cannot be navigated profitably for commercial purposes ascending at any time, and can only be used descending for the transportation of logs and rafts for short periods of time, when swollen with rain, ten or twelve days in each year.

"The remaining question, then, is whether this stream is a public highway, which the public has the right to use for transportation purposes, and whether the plaintiff in error, by the maintenance of his dam across the same is unlawfully obstructing it.

"While the beds of all streams not navigable in the legal sense belong to the riparian proprietors and are private property, yet if in its natural state the volume of a stream, whether ordinary or when swollen by rains, at certain periods of the year occurring with reasonable certainty, is such that the stream can be used profitably for commercial purposes in the transportation of the products of the forests, mines, tillage of the soil, other articles of commerce, the public has an easement of highway therein, and this easement cannot be unreasonably obstructed by the riparian proprietors.   *   *   *.

"This easement, however, does not extend to all streams in this State. The stream must be of sufficient size to float, by the force of the current, and without the aid of persons traveling upon the banks, craft and rafts of sufficient size to make the business profitable. It is not sufficient that loose logs or lumber can be floated down it when at flood. Streams of that character are not subject to the public servitude, but are private property. We think that Wolfe river is such a stream that the public has an easement in, and the right to use its waters for floatage at such periods, as this right can be profitably exercised in the natural state of the stream. This easement, however, is not an absolute and unqualified right of way. The riparian proprietors also have rights in such streams as valuable as that of the public, and these respective rights of the public and the riparian proprietors must be so used and exercised as

not to unreasonably interfere with and obstruct each other."

This case is the only one in our Reports which puts on a clear basis floatable streams as a distinct class.

From a consideration of all of these cases it is perceived that our authorities recognize three classes of navigable streams, viz.: First class, those navigable in law; second class, those navigable in fact; third class, floatable streams. There always occurs to the mind of any one examining the subject an ambiguity arising out of the expressions navigable in law and navigable in fact, since, of course, the first are *actually* navigable as well as the second, and even in a much ampler sense. But so it is the two expressions have acquired a technical meaning—the first as indicating a degree of navigability so great as that the sovereign not only owns in trust for the public the stream of water itself, but also the bed of the stream, and cannot alienate either; the second to indicate that the streams belonging to that classification have a degree of navigability so much less that individuals, without injury to the public welfare, may own proprietary rights in the bed thereof, and such rights as in law attach to such ownership, subordinate, however, to the right of the public to use the stream as a highway.

Confusion has arisen in the effort to distinguish between streams of the first and second class; the distinction being based on the kind of craft they can sustain and float

The difficulty is very slight, however, if we adhere to the definitions laid down in *Stuart* v. *Clark's Lessee*. I repeat that definition at this point. This is the definition of a river of the first class: "A river capable, in the ordinary state of the water, of navigation, ascending and descending by sea vessels; that is, such vessels as are employed in the ordinary purposes of commerce, whether foreign or inland, and whether stream or sail vessels." We think the meaning of the court in using the term "such vessels" in the definition just quoted is more fully expressed by "such sea vessels;" that is, such sea vessels as are employed in the ordinary purposes of commerce, as distinguished from war vessels, which are much larger. This meaning is emphasized by the contrast in the definition of streams of the second class, which are referred to, among other characteristics, as those capable of bearing "perhaps small vessels of lighter draft than ordinary;" also by the reference in *Elder* v. *Burrus*, supra, to the great rivers, Mississippi, Missouri, Ohio, and Tennessee, and "all rivers, even above tide water, provided they are navigable for ships or boats."

The second class is composed of streams which the opinion thus defines: Those "which, though not navigable in the sense of the law, are yet of sufficient depth, naturally, for valuable floatage, as for rafts, flatboats, and perhaps small vessels of lighter draft than ordinary;" understanding as a natural condition of such a river those annual periods of swollen tide, lasting for weeks or months, as shown in *Sigler* v. *State*, supra, which enable them to bear for the time being such valu-

able floatage as rafts, flatboats, and small vessels of lighter draft than ordinary.

The third class is accurately defined, as I have stated, in *Miller* v. *State,* supra.

If these definitions were always kept in mind, there would be less confusion on the subject in the minds of counsel, and less than that which has been sometimes exhibited in the opinions of the court.

Here I may, properly, as I think, turn aside from the main current of the discussion to say that the decision of the court in the present case upon the question of navigability, if contrary to what has been previously held, as set forth in the preceding cases, will, as I have already indicated, have an effect far beyond the present controversy. If it be declared that waters three or four feet deep (such as those intervening the bank and the deep water out in the lake), and capable of floating a light-draft steamboat, are navigable in law, the beds of all streams in this State that can bear such craft will be thereby declared to belong to the State. The rule that the title of riparian owners extends to the middle of the stream, where lands are bounded on streams now falling within the second class, will be abrogated; moreover, every stream where the question of depth is in doubt will be drawn into litigation, and the people of the State will in course of time reap as a result of this one lawsuit a vast harvest of other litigations. It was declared in *Miller* v. *State,* supra, that the legislature could not arbitrarily declare a stream navigable (meaning navigable in law); the effect of such declara-

tion being, if sustained by the court, to transfer the title of riparian owners in the bed of the stream to the State. It was held in that case that this was taking property without due process of law, and was unconstitutional. We are now asked by the State to do the same thing by a judicial decision reversing the rules of law upon this subject which have been operative for sixty years, or ever since the case of *Stuart* v. *Clark's Lessee* was decided. This ought not to be done. These rules of navigability, so long held in our State, are, as already stated, rules of property, affecting not only the waters, but the land under the waters, and the fisheries appertaining thereto, and whether they were rightly or wrongly established at the time (and I think they were correctly and wisely established), they should now be rigidly maintained, because the people had a right to rely on them in acquiring their titles. For the purpose of making good its claim to the body of water in litigation here, the State ought not now to ask the court to set aside rules of property and make a precedent the result of which would be to transfer to it without compensation the lands of so many people over its area. It often happens that litigants, desiring a particular end, overlook the general consequences, the latter of which are not infrequently of vastly more moment than the particular occasions which produced them.

4. It is perceived that the rules heretofore established by the court all apply to streams as highways in which the State or its people have an easement; the State owning the water highways of the first class. Do

they apply to lakes?   I think they do not.   I think the
rule of the common law on the subject of lakes remains
undisturbed. The departure from the common law, first
made in *Elder* v. *Burrus,* supra, and followed in *Stuart*
v. *Clark's Lessee,* supra, and subsequent cases, was con-
fined to rivers as highways. This is apparent all through
the cases.   As said in *Stuart* v. *Clark's Lessee*:  "It is,
to be remarked that the only change of the common law,
effected by the adoption of the rule of the civil law with
us, is the substitution of a new and more appropriate
criterion of a navigable river. . . .   In all other re-
spects the principles of the common law, regulating
and defining the respective rights of the public and of
the riparian proprietors in rivers of whatever charac-
ter, remain unchanged, and are to be applied by our
courts." So, the change referred to was the only one
which was made in the common law by our cases, leav-
ing the common-law rule as to lakes binding on us.   Acts
1788, ch. 5, provides that such parts of the common
law as were "heretofore in use in the territory, not de-
structive of, or repugnant to, or inconsistent with, the
freedom and independence of this State, and the frame
of government therein established, and which are not
abrogated, expired, or become obsolete, shall be in full
force in this State."   So the common law on this sub-
ject has, for us, all of the sanction of a statute, unless
not suited to our condition.   No such claim, in my opin-
ion, can be rationally made.   There is no such difference
as the one which justified us in departing from the rule
based on tidal rivers.   We have lakes, and the British

Islands have lakes, several in England, also in Ireland, and also in Scotland. There are twenty of such lakes in Scotland, the largest of which are as follows: Ness, twenty-four miles long and 433 feet deep; Lomond, twenty-two miles long, 121 feet deep; Awe, twenty-five miles long, 104 feet deep; Shiel, seventeen miles long, 132 feet deep; Shin, seventeen miles long, fifty-one feet deep; Tay, fourteen miles long, 199 feet deep. In Ireland there are six of such lakes, the largest of which are as follows: Corrib, twenty-seven miles long and thirty feet deep; Derg, twenty-four miles long, thirty feet deep; Lower Erne, twenty-four miles long, forty-three feet deep; Upper Erne, thirteen miles long, ten feet deep; Neagh, seventeen miles long, forty feet deep. In England there are ten lakes located in the well-known lake region, made famous by the English poets. The largest of these, Windermere, is ten and one-half miles long and seventy-eight feet deep. There is another, Ulleswater, over seven miles long, and eighty-three feet deep. These facts are drawn from the latest edition of the Encyclopedia Brittanica, art. "Lakes." Our mother State, North Carolina, has not found it incompatible with her condition to apply the English rule to a lake fifteen miles long and eight miles wide. *Hodges* v. *Williams,* 95 N. C., 331, 59 Am. Rep., 242. Likewise Missouri, *Kirkpatrick* v. *Yates Ice Co.,* 45 Mo. App., 335; Ohio, *Lembeck* v. *Nye,* 47 Ohio St., 336, 24 N. E., 686, 8 L. R. A., 578, 21 Am. St. Rep., 828; Michigan, *Webber* v. *Pere Marquette Boom Co.,* 62 Mich., 626, 30 N. W., 469; *Clute* v. *Fisher,* 65 Mich., 48, 31 N. W., 614;

New Jersey, *Cobb* v. *Davenport*, 32 N. J. Law, 369; South Dakota, *Olson* v. *Huntamer*, 6 S. D., 364, 61 N. W., 479; and Utah, *Poynter* v. *Chipman*, 8 Utah, 442, 32 Pac., 699. In the latter case it was held that an inland fresh water lake, thirty miles long and twelve miles wide, navigable for boats of 500 tons capacity, was not of such size and importance as to be classed with the great navigable lakes of the country, so as to justify a departure from the general rule of the common law relative to the rights of riparian owners in lands bordering on nonnavigable waters.

What is the common-law rule on the subject? This is fully discussed and the authorities cited in *Hardin* v. *Jordan*, 140 U. S., 371, 11 Sup. Ct., 808, 838, 35 L. Ed., 428, in an opinion by Mr. Justice Bradley.

After examining the question, and reaching the conclusion that at common law lakes may be owned as private property, the learned justice continued in further support of his conclusion as follows:

"But we are not without express authority, in addition to that of Lord Coke, as to the rule of the common law. As before observed, the small number in England of the bodies of water of the kind now under consideration would lead us to expect but few decisions on the subject compared with those relating to rivers and streams. But the precise question has been brought before the court in recent times, and has been decided as from the reason of the thing we should anticipate it would be. *Bristow* v. *Cormican*, L. R., 3 App. Cas., 641, is directly in point, and received the consideration of

the best legal minds of England. It related to riparian rights in Lough Neagh, a lake in the north of Ireland, about fifteen miles in length (north and south) and about ten miles in breadth, situated some fifteen miles west of Belfast, and having the town of Antrim near its northeastern extremity. The plaintiff sued the defendants in trespass for fishing in the lake, and deraigned title from the crown by a grant made in the time of Charles II. of all the fishings in Lough Neagh, and the question was whether the crown had the right to make such a grant. The decision was unanimous that it had not. Lord Cairns, then Lord Chancellor, said: 'The crown has no *de jure* right to soil or fisheries of a lough like Lough Neagh. Lough Neagh is, as your lordships are aware, the longest inland lake in the United Kingdom, and one of the largest in Europe. It is from fourteen to sixteen miles long, and from six to eight miles broad. It contains nearly 100,000 acres; but, though it is so large, I am not aware of any rule which would, *prima facie,* connect the soil or fishings with the crown, or disconnect them from the private ownership either of riparian proprietors or other persons.' Lord Hatherley said: 'This is an inland lake, and therefore it is not a portion of the land belonging to the crown by reason of its being on the shore of the sea, or a navigable, straight or river.' Lord Blackburn added: 'The first question that I shall discuss is whether it is conclusively shown that Charles II had, in 1660 and 1661, title to the property he purported to convey. I think he had not. The property in the soil of the sea and estuaries,

and of rivers in which the tide ebbs and flows, is, *prima facie,* of common right, vested in the crown; but the property of dry land is not of common right in the crown. It is clearly and uniformly laid down in our books that, where the soil is covered by the water forming a river in which the tide does not flow, the soil does of common right belong to the owners of the adjoining lands; and there is no case or book of authority to show that the crown is of common right entitled to land covered by water, where the water is not running water forming a river, but still water forming a lake.' Then, after taking notice of a hesitating remark on the subject made by Justice Wightman in *Marshall* v. *Ulleswater Steam Navigation Co.,* 3 Best & S., 742, and of the apparent inconvenience of adjoining owners of small holdings on the borders of a lake going out to the center, he adds: 'It is, however, necessary to decide whether the crown has of common right a *prima facie* title to the soil of the lake; I think it has not. I know of no authority for saying it has, and I see no reason why it should have it.'

"Of course, this decision has not the controlling authority which it would have had, if it had been made before our Revolution. But it is the judicial decision of the highest authority in the British empire, and it is entitled to the greatest consideration on a question like this, of pure common law."

Mr. Justice Bradley then, after distinguishing the Massachusetts cases as being based on a colonial ordinance adopted in 1641, which provided that great ponds

containing more than ten acres of land, and lying in common, though within the bounds of a town, should be free for fishing and fowling, and which, as amended by the ordinance of 1647, prohibited the towns from granting away great ponds, but affirmed their power to regulate the fisheries therein, as well as in tide water, and affirmed the power of the legislature to dispose of great ponds, tidal bays, coves, and rivers, or of the common rights of fishing and fowling in them, and after stating that these ordinances seem to have been the foundation of a local common law in Massachusetts (including Maine) which has led to a course of decisions with regard to the title of lakes and ponds at variance with the general common law, and which have been followed in New Hampshire and some other States, according to which it is there held that the land under water in such lakes and ponds belongs to the State, and not to the riparian owners, and that when land is conveyed bounding upon a natural lake, or pond, the grant extends only to the water's edge, then cites most of the cases I have already referred to, discusses and quotes from some of them, and proceeds:

"But we forbear to quote further the reasonings of the cases. There are many more to the same effect, all going to demonstrate what the rule of the common law is with regard to the ownership of the beds of inland lakes, not of such size or importance as to be classed with the great navigable lakes and rivers of the country. We need not depend upon the English case of *Bristow* v. *Cormican* alone, great as its authority neces-

sarily is, but are surrounded by a cloud of witnesses in our own country whose testimony is in harmony with that decision."

By the great lakes which he excludes in the sentence last quoted it appears from the opinion elsewhere that he had reference to our great inland seas, Lake Michigan, Lake Superior, Lake Erie, Lake Champlain. He shows that the fact that the lake is navigated by steamboats does not change the rule of the common law, which was proven by *Smith* v. *Rochester,* 92 N. Y., 463, 44 Am. Rep., 393. "The latter case" said he "related to Hemlock Lake, which is seven miles long and half a mile wide, and navigated by scows, steamboats, and other craft. The legislature of the State authorized the city of Rochester to take the water of the lake for the use of the inhabitants of the city, subject to the payment of damages for injury to private property. The plaintiff, owning mills which were driven by the waters of the lake, applied for an injunction to restrain the city authorities from taking the water; and the defense was that the lake was the property of the State, and that the State had a right to dispose of the water. The opinion of the court of appeals, by Chief Justice Ruger, exhibits a careful and able examination of the law on the subject. After adverting to the constitution of the State, framed in 1777, by which the common law and the statutes of England and the colony were continued as the law of the State, subject to such alterations as the legislature might make, and also adverting to the peculiar action of the legislature in assuming the ownership of

the lands under the waters of the Mohawk and the Hudson above tide water, he takes up the case upon the general principles of the common law, and comes to the conclusion that Hemlock Lake is not such a body of water as under any rule entitled the State to claim the ownership of the bed, and that its only right was that of eminent domain by virtue of its sovereignty."

I think I have thus proven, by most ample and indubitable authority, that under the common law of England, which is also the common law of this State, lakes are not owned and held by the sovereign in trust for the whole people of the State, and cannot be granted to private persons, but that, on the contrary, they are the subject of private ownership and may be granted as other lands are granted.

5. But if it be thought that this court should not follow the common law on this subject, but rather the civil law, the result is the same. In the case already referred to, *Hardin* v. *Jordan*, there is a discussion of this subject with citation of authority by Mr. Justice Bradley, of which I avail myself, viz.:

"In Scotland, where there are many lakes, often of large extent, there has never been any doubt on the subject. It is true their system of laws is founded on the civil law, by which lakes and ponds are regularly of private ownership. Lord Selborne, in *McKenzy* v. *Banks*, L. R., 3 App. Cas., 1324, 1338, says: 'It is to these facts that the law of Scotland with respect to the rights of riparian proprietors in inland lakes has now to be ap-

127 Tenn.—41

plied. Under titles such as those by which both the competitors in the present case hold (and when nothing turns upon any evidence of exclusive possession), the entire lake, if surrounded by the land of a single proprietor, belongs to that proprietor, as a "pertinent" of his land. If there are more riparian proprietors than one, it belongs "ratably" to them all. So far as relates to the solum or fundus of the lake, it is considered to belong in severalty to the several riparian proprietors, if more than one; the space inclosed by lines drawn from the boundaries of each property *usque ad medium filum aquae* being deemed appurtenant to the land of that proprietor, exactly as in the common case of a river.' But as to the rights of boating, fishing, and fowling, Lord Selborne added: 'These are to be enjoyed over the whole water space by all the riparian proprietors in common, subject (if need be) to judicial regulation.' See, also, to the same purport, Burge, Col. & For. Law, vol. 3, page 425; Justinian's Digest, lib. 8, tit. 3, f. 23, sec. 1. And centuries before Justinian, Cicero spoke of the many lands, houses, *lakes, ponds,* places and possessions (that were) confiscated by Sulla, and conferred upon his own favorites. Agra. Law Orat., 3, chaps. 2, 7."

He then continues, in amplification of the subject:

"As many features of the common law with regard to the rights of riparian owners were borrowed directly from the civil law (Hale, De Jure Maris, pt. 1, chap. 6, page 28), it would not be strange if the rule relating to lakes and ponds came from the same source. It was recommended by the same reason that applied to fresh wa-

ter rivers and streams. When land is bounded by a lake or pond, the water, equally as in the case of a river, is appurtenant to it; it constitutes one of the advantages of its situation, and a material part of its value, and enters largely into the consideration for acquiring it. Hence the presumption is that a grant of land thus bounded is intended to include the continuous land covered by water. Besides, a lake or pond, like a river, is a concrete object, a unit, and, when named as a boundary, the natural inference is that the middle line of it is intended; that is the line equidistant from the land on either side. If the margin is named as the boundary, the case is different; the land under the water being then expressly excluded. Of course, these observations do not apply to our great navigable lakes, which are really inland seas, and to which all those reasons apply which apply to the sea itself."

It thus appears that, both by the common law and the civil law, lakes are the subject of private ownership. It seems to me this should close the question. It must close the question, unless there is something in our situation on the subject of lakes fairly and justly distinguishing it from the situation of the British Islands and our own States which have applied the common law, and all of the countries in which the civil law regulates, on this subject, the rights of men. No such distinction has been pointed out, and none is suggested to my own mind.

6. But I shall now lay aside, for the moment, the reasoning and the authorities contained and referred to in

the preceding paragraphs, and consider the case just as if the rules governing the subjects of navigability in law and navigability in fact as applicable to rivers also apply to lakes. This was the point of view from which the court treated the controversy over this same lake in *Webster* v. *Harris,* supra, overlooking the principle that lakes are not subject to the rules governing the navigability of rivers. The court in that case did not refer to this subject at all, or show that the subject was in mind, or had been considered. In that case, treating the subject in the light of the principles governing the subject of navigability, the court held that the lake was navigable in fact, but not navigable in law, and hence that its bed was subject to private ownership, but that the public had an easement of passage therein, as upon a river of the second class.

Now, treating the present case from the same standpoint: The facts shown in this record are substantially the same as those set forth in the opinion of the court in *Webster* v. *Harris,* supra, with the following exceptions: It is made to appear more clearly in the present case that the water touching the shore of the lake on all sides and separating the shore from the deep basins within is very shallow, and another exception which I shall presently mention. It is shown that near the shore all around the water is very shallow, only a few inches in depth, except at two or three places, where it is perhaps four feet deep. It is more than 100 feet at every point to deep water, and very much more than that before either of the open basins within the lake is

reached; so that it would be impossible to launch any boat applicable to rivers of the first class as defined in *Stuart's Lessee* v. *Clark.* This consideration alone would mark the water as belonging to the second class, and hence not navigable in law.

The evidence shows that the lake is of a very irregular shape, at some points only two miles in width, at others seven or eight miles, sprawled upon the earth like water splashed on a rock, and extending itself in numerous sinuosities and angles or inlets, the latter of which are separated by peninsulas or tongues of land. In length it is about fifteen miles. It is described by the witnesses as presenting the appearance of a deadening in a forest; by others as having the similitude of water covered with the masts of ships. All over it, except in the recessed basins, which are themselves unconnected, and not much more than a mile each in extent, some much less, and five or six in number, there are trees still standing, and the snags of those which have fallen, and under the water thousands of stumps of trees that are not visible from the outside, but are a few inches under the surface. It would be impossible even for a steamboat of the light draft applicable to rivers of the second class, under the rules laid down in *Stuart* v. *Clark's Lessee,* supra, to navigate this lake, unless a lane should be cut out for it, or roadway, by removing the stumps standing under the water. Right here should be mentioned the second exception above referred to. It was made to appear that a float road, as it is called, in the record, was cut out by one H. M. Wil-

son across the lake at one point, by sawing off the stumps under the water to a depth sufficient to allow the floating of a considerable raft of logs. This was done at small cost. The evidence on the subject was introduced in this case and relied on by the State to discredit the position, taken in *Webster* v. *Harris,* that the cost of removing the obstructions from the lake would be so great as that the outlay would not correspond to the benefits to be obtained thereby—so great, indeed, as that it would require the great resources of the federal government to make the attempt successful. I do not think that the evidence proves the point. Cutting out a lane in the manner stated, a few yards wide, is one thing, and removing all the obstructions from a lake fifteen miles long, and of the width and shape already indicated, would be quite another. No figures are given upon this latter aspect of the case; nor are any figures given upon the expense of deepening the lake, and making of sufficient depth its many miles of shallow water at the shore all around it. And if this could be done, would it ever be done? A striking fact about this case is that the navigability of the lake is not thought of at all for its own sake, but it is sought to prove that it is navigable in law—that is, like a first-class river—not for the purpose of having the lake cleaned out, or of ever using it as a navigable body of water, but solely for the purpose of getting possession of the fishery rights and hunting rights on the lake, on the theory that, if navigable in law, the bed of the lake and the waters resting thereon belong to the State in trust for all the people, and can-

not be, and could not be, granted to private persons; hence that the defendants' grants were and are inoperative.

It is insisted, however, that the channels of Reelfoot river, or creek, and the channel of Bayou de Chien, are still distinguishable in the lake, and also the channel made by their junction, in the lake; that these channels are free of stumps and trees, and are broad enough and deep enough for the passage of large boats. It is true that the outline of the channels of these drowned streams can still be distinguished within the lake by sounding with pole or paddle, and noting the stumps of trees under the water lining the banks, although nothing of this can be seen on the surface of the lake, which presents the appearance of a single sheet of water, the drowned streams having no current. It is true that these channels are from sixty to ninety feet wide, that they range in depth from seven to ten or eleven feet deep, and that there are only a few stumps in them. There are, however, a good many fallen trunks of trees in them here and there, and in the channel of Bayou de Chien there is an obstruction for about 100 yards of its length that reduces its depth according to the weight of the testimony to about twelve or fifteen inches, and at points to a depth less than this. It also appears that at the lower end of the lake the channel of the united stream is lost before the bank is reached, and opposite this place, according to the weight of the evidence, the water does not exceed at the bank four feet in depth, and there are stumps between the end of the channel

and the bank. So that this channel is cut off at the south by shallow water and stumps. Likewise at the northern end, where Reelfoot river enters the lake, the water is shallow; also where Bayou de Chien enters the lake on the north. It thus appears that the channels of deep water are as effectually cut off from the bank by shallow water and by stumps as the deep basins are. Therefore the existence of these channels does not simplify the situation at all. No ship or boat of the first class, as required by the rules laid down in *Stuart* v *Clark's Lessee,* supra, could pass into these channels. So the situation remains as found in *Webster* v. *Harris.* supra. So far as the water is fitted for navigation at all, it is fitted only for boats of the second class, those of light draft, which can run over the sunken stumps. And it has been proven that it is not even fitted for these. Some years ago a faithful effort was made to use such a small steamer on this water, with the result that it soon sank. It was used on three trips across the lower end of the lake, threading its way with the greatest difficulty, requiring more than a day to cover seven or eight miles, and finally sank on the third trip. The witnesses do not say what special thing caused it to sink, but refer it to the general difficulties of navigation in the lake. However, some of the witnesses, in speaking of the difficulties of such navigation, say that the stumps would tear the wheels from a boat. There is a little gasoline launch which operates on the lake, carrying twenty or twenty-five passengers; but the witnesses say this does not draw any more water than a

large skiff.  I do not think any one can soundly reach a conclusion that this water is capable of being navigated by such vessels as are referred to in *Stuart* v. *Clark's Lessee*, supra, the capability for the bearing of which is used in that opinion for marking watercourses of the first class; that is those navigable in law.  The effort is rather to show that it can support small boats of light draft, such as are "used in commerce," on the theory that, if a stream of water is large enough and deep enough to permit the use of any boat which is used in commerce, that stream is one which falls within the designation of a stream navigable in law.  I have already shown the fallacy of this view under the rules laid down in our cases.

We have been referred to decisions holding in substance that, although there are obstructions at places here and there in a river that have to be removed before the river, navigable at other places, can be made navigable for its whole length (as where a river is navigable for the most part, but there are reefs or other obstructions at intervals, where portage has to be employed to transfer freight from a point above the obstruction to a point below), such obstructions do not destroy the navigability of the river.  I see no objection to this view.  A navigable river is a highway, just as a road or street is a highway, and it can be no impeachment of a highway as such that obstructions may have to be removed before its whole length can be utilized. But who would think of calling a dense forest a highway, because it is possible to cut down the trees, dig

up the stumps, smooth the space thus created, and make
it into a useful roadway, or highway? A strip through
a forest might, in the manner stated, with sufficient
labor and the application of proper materials, be con-
verted into a turnpike, or a macadam road. It is true
that through this forest there must have run at that
time the two streams already mentioned. But who can
know at this date, 100 years later, how deep they were,
or whether they were capable of bearing boats of any
kind? Their present depth indicates nothing on this
head, because these channels are filled, not with their
own waters, but with the waters of the lake. These two
streams, as they now appear on the outside of the lake
to the north, are so shallow as that they cannot have
borne any craft except canoes or skiffs. The evidence
shows by immediate inference that in the winter of 1811-
12, when the earthquake lowered the land on which the
lake now rests, the land was covered with a dense for-
est, with here and there an open space. The trees stood
up in the water, after the ground sank in which they
were rooted, like the trees in a forest. The number of
trees and their height can only be inferred at this
length of time from what we know of the heavy timber
growth in the Mississippi bottom, and from the thou-
sands of stumps with which the bottom of the lake is
now studded. Old men, witnesses in the case, tell us
that when they knew the lake sixty and seventy years
ago. there was a great deal more timber standing in it
above the water than there is now, and a great many
more bodies of trees that had been broken off and were

Reelfoot Lake Case.

resting upon the surface of the lake.  This was say thirty or forty years after the earthquake, but would represent the condition of the lake about the time the Caldwell grants were made.  Could any one with any show of reason call such a scope of country a highway? It is true that it was possible to cut down all of the trees and grub up all of the stumps, take them out of the water, and transport them to the firm ground on the outside, and the water would be left, over which water craft might be floated.  So would the ground be left on which forest trees had stood, after the removal of the trees, and wagons and other land vehicles might run over it.  But in the former case no more than in the latter could the scope of country so covered with trees be regarded as a highway before the removal of the trees and the construction of the road.  I emphasize the idea or thought contained in the word "highway," because that is the point of view from which the sovereign regards it as a trust for the people.  The seas and the oceans are called the highways of the nations.  Our navigable rivers are designated in this State and in others as highways.  A sovereign may either own the highway or have a mere easement of passage; so it is as to rivers. The great rivers are owned as highways for the benefit of the people.  In lesser rivers, capable of such service, the sovereign owns an easement of passage for the benefit of the people.  So, the sovereign may own a great roadway through the country—that is, on the ground— and may have an easement of passage merely in others. But a standing forest cannot be called a roadway,

whether the trees stand clear in the earth, or their roots and parts of their boles or bodies stand immersed in water. I know of no case in the books that gives a hint that such a combination of water, stumps, and trees, to say nothing of a great sandbar, vast accumulations of mud, and thick growth of aquatic plants, can be called a highway.

Before passing from this part of the case I should notice the fact that complainant cites a number of federal cases on the subject of the navigability of streams, and gives the dimensions of a number of very small craft that are subject to the jurisdiction of the United States courts in the regulation of interstate commerce. These cases and the craft referred to have no bearing, as I think, upon any question in this case. The determining principle on which such cases proceed is the capacity of the stream, no matter how small or how great, for the purposes of interstate commerce. But, as already pointed out, the purpose of making inquiry as to the navigability, and the grade of it, or degree, in the class of cases we have before us, is totally different; that is, to ascertain the ownership of the underlying earth as a basis for the assertion of the rights appertaining thereto. The soundness of the view here stated is recognized in the most recent decision of the supreme court of the United States in the case of *Donnelly* v. *United States*, 228 U. S., 243, 33 Sup. Ct., 449, 57 L. Ed., —. I hardly need add that the case of *Illinois Central R. R. Co.* v. *State of Illinois and City of Chicago*, 146 U. S., 387-476, 13 Sup. Ct., 110, 36 L. Ed., 1018, has no application, as

that case concerned land under the waters of Lake Michigan, one of the great inland seas of our country.

7. It is insisted that the rights of fishery do not go with the soil, even if that belongs to the defendant. The authorities are directly to the contrary.

It was said by Chancellor Kent:

"It was a settled principle of the common law that the owners of land on the banks of fresh water rivers, above the ebbing and flowing of the tide, had the exclusive right of fishery, as well as the right of property, opposite their respective lands *ad filum medium aquae,* and where the lands on each side of the river belong to the same person he had the exclusive right of fishery so far as his land extended along the same. The right existed in rivers of that description, though they might be of the first magnitude, and navigable for rafts and boats, though they are subjected to the *jus publicum,* as a common highway or easement for navigable purposes." Comm. (12 Ed.), vol. 4, p. 412.

Washburn says:

"At common law the right to take fish belongs so essentially to the right of soil in streams where the tide does not ebb and flow that, if the riparian proprietor owns upon both sides of the stream, no one but himself may come within the limits of his land and take fish there." Easements and Servitudes (4 Ed.), p. 561.

Farnham says:

"When the soil over which the water runs and the water itself belongs to the same person, the owner cannot be correctly said to have a right of fishery; because

the land and its profits are so completely identified as
his inheritance that they cannot be separated. There-
fore the fishery is included in land and water; and
since, in the absence of express reservation, land in-
cludes water, a grant of land will include both water and
fishery." Farnham on Waters, p. 1376. "Again, since
the right to fish follows the title to the soil, there is
no public right of fishery in a lake the title to the bed
of which is in private ownership." Id., 1427.

Gould says:

"Where a fresh, navigable river is held to be private
property, the crown or State and the public have no
rights in it which are not connected with navigation."
Gould, Waters (2d Ed.), sec. 46, p. 109.

We are referred to *Willow River Club* v. *Wade*, 100
Wis., 86, 76 N. W., 273, 42 L. R. A., 305, as laying
down a different doctrine, and so it does. That case
holds that, although the riparian owner owns the land
lying under a stream of water, yet the fishing rights
in the water belong to the public, and not to such ripa-
rian owner, although, as we infer, he might own both
sides of the stream. This is not the common law, and
cannot be followed in this State. We are also referred
to *Lamprey* v. *State*, 52 Minn., 181, 53 N. W., 1139, 13
L. R. A., 670, 38 Am. St. Rep., 541. That case, while ad-
hering to the common-law rule that fisheries in streams
navigable in law belong to the public, and fisheries nav-
igable in fact belong to riparian owners, yet states a
test of navigability in law wholly at variance with our
cases, and to adopt which would overrule them all. Un-

der the Minnesota rule of navigability in law, very inferior streams would be entitled to that distinction—probably any stream that could float a commercial log, or could be used for any purposes of commerce. In Tennessee the division of streams into those navigable in law, those navigable in fact, and those merely floatable is clearly marked, as I have already shown, and I need not recur to that subject.

We are referred to the case of *Peters* v. *State*, 96 Tenn., 682, 36 S. W., 399, 33 L. R. A., 114, for the proposition that the State has the right to fisheries in lakes. This contention is a misunderstanding of that case. It appeared that two persons owned a lake in Lauderdale county, one person about 1,000 acres, and another forty acres; the forty acres being an arm of the lake. The case dealt with an act which made it unlawful for any one to seine for fish in any of the streams, lakes, rivers, or ponds in this State, or to take fish in any way, except by rod, line, or trot line. It is provided, however, that the act does not apply to private ponds. Peters, who owned the larger part of the lake, was indicted for seining in this lake. His defense was that it was a private pond, and that the act did not apply. The court held that, inasmuch as another person owned an arm or part of the lake, it was not a private pond in the sense of the act, because the fish could run from one part of the lake to the other, and that neither of the owners would have the right to take fish in the interdicted manner; that, if such conduct were allowed, either might gather all of the fish into his part of the lake and destroy

them, to the hurt of the other. In addition, it may be said that the statute in question would be equally appli cable to streams which, under the law of this State, are unquestionably not navigable in law, but only navigable in fact, as to the latter class of which streams it is held that the soil under them belongs to the riparian owners and under the common law the fishing privileges; yet the legislature might lawfully prevent any one from seining in any such streams, indeed, in those which are not even floatable, but mere creeks, on the grounds stated in the opinion just referred to as to the running of fish up and down stream in the waters flowing over the lands of different owners.

We are also referred to the case of *State* v. *Ashman*, 123 Tenn., 654, 135 S. W., 325. That case treated the constitutionality of an act prohibiting nonresidents from engaging in the business of taking pearl mussels or other shellfish for profit in the waters of this State, without first obtaining a permit or license from the clerk of the county court of the county where such waters are lo- cated, and payment of the privilege tax imposed upon nonresidents engaged in that business. This case did not concern the rights of any riparian owner, or any person claiming a right to the soil under the water, and is inapplicable to the present controversy.

8. It is insisted that, because for a great number of years people hunted and fished at will over the lake, it may be for forty or fifty years, until in 1902 the West Tennessee Land Company united all titles in itself, and a few years afterwards undertook to prevent the incur-

sions of trespassers, a dedication arose in favor of the public.  This question is also closed against complainant's contention by authority.  *Albright* v. *Cortright*, 64 N. J. Law, 330, 45 Atl., 634, 48 L. R. A., 616, 81 Am St. Rep., 504; *Cobb* v. *Davenport*, 32 N. J. Law, 369.  In the first of these cases a like use of a lake for sixty years was held not to carry a dedication.  The first-named case referred to the second as the leading case in New Jersey on this subject and stated its substance as follows:

"The plaintiff claimed to own a natural, nontidal lake in Morris county, called 'Green pond.'  The action was trespass for breaking his close and fishing in water that covered his land.  The defendant pleaded the general issue, denying that the plaintiff had an exclusive right to fish in said pond, set up the statute of limitations and license from the plaintiff, and also alleged a prescriptive right to fish, by virtue of certain grants to persons under whom the defendant claimed.  A verdict was rendered for the defendant, which was set aside on rule to show cause.  The supreme court held that the plaintiff had proved his title, and that the defenses by way of limitations, license, and prescription were not sustained.  Among the legal conclusions to be drawn from this case are these:  That the soil under a fresh water pond in New Jersey is not in the State, but is in private ownership; that the exclusive right of fishing therein is *prima facie* in the owner of the soil, but may be acquired separate from the ownership of the soil; that the right of the public to fish in private waters cannot be claimed by custom, or established by proof of

customary right; and that such right can be acquired only by grant or prescription, and must be prescribed for in a *que* estate. The following extract from the opinion will show both how strong was the proof of user in that case, and how closely the facts resemble those now in view: 'The evidence in this case shows that the public in general, for a period of forty years and upwards, were accustomed to fish in the pond in question without hindrance or molestation, and the permission to do so was neither asked nor granted; that the fishery was never used by its owners, either before or since the plaintiff acquired title, as a source of pecuniary profit, but that every one, without regard to residence or tenure of lands, was permitted to fish in all parts of the pond at will, and whenever his inclination prompted him to do so; and that this privilege was exercised under prevalent impression that the fishery, in the language of one of the witnesses, was a free fishery. And it is a noticeable fact in the case that, although the witnesses who fished in the pond testify that they did so under a conviction of their right, yet no one claimed a right personal to himself, or other than such as it was thought belonged to the public in general. This evidence tends merely to establish a customary right in all the inhabitants and frequenters in that locality to fish in these waters, if a right to fish could be established by proof of custom. But the right of fishing, being a profit *a prendre* in another's soil, as distinguished from an easement, cannot be claimed by custom, but must be prescribed for in a *que* estate. . . . The defendant

cannot justify under a custom, nor will proof of a custom sustain a plea of prescriptive right, because the two rights, though they may coexist in the same land, are of a completely different nature.' The defendant subsequently applied for leave to file an additional plea justifying the alleged trespass on the ground that the fishery had become public by dedication. Leave was granted in order that the question might appear on the record, and the plea was then, after argument, struck out. The opinion is reported in *Cobb* v. *Davenport,* 33 N. J. Law, 223, 97 Am. Dec., 718. The conclusions expressed by the court are that the right to fish and take fish *in alieno solo* is not an easement, but is a profit *a pendre.* and can be acquired only by grant or prescription, which must be pleaded; that such a right, so universal and unqualified as to subsist in the entire public, cannot be gained by custom or prescription; and that the doctrine of dedication to public uses does not embrace a claim of this character."

To same effect is *Lembeck* v. *Nye,* supra.

We are referred to *Stump* v. *McNairy,* 5 Humph., 363, 42 Am. Dec., 437, for the principle that, when the public has used for purposes of navigation a waterway for twenty years under a claim of right, it acquires an easement therein for the purpose indicated. The principle is sound, but has no application to a claim of fishery rights in the public, as shown in the New Jersey cases above referred to, reported in 64 N. J. Law, 330, 45 Atl., 634, 48 L. R. A., 616, 81 Am. St. Rep., 504, and *Lembeck* v. *Nye,* supra. The public, by hunting and fishing

at will in the outlying waters of an owner thereof, would no more acquire title to the waters or the right to fish or hunt thereon than the act of the same public in picking blackberries, or hunting hickory nuts, or shooting game on a man's outlying land, would give title to the land.

In what has been said I have considered all of the contentions of the parties, and reached the conclusion, soundly, as I believe, that the State is not entitled to any relief in the present case. In my judgment, the best solution of the controversy would be to permit the case of *Webster* v. *Harris,* supra, to remain undisturbed as a rule of property controlling the special piece of property involved in this controversy. It is true, as I believe, that that case was placed upon an erroneous theory; but of this the State cannot complain, because, as a result of the application of such theory, a declaration has been made in behalf of the citizens of the State to the effect that the lake is a body of water navigable in fact, and also that it cannot be drained. As a consequence of treating the lake as a body of water navigable in fact (and one not navigable in law), the bottom of the lake is as susceptible of private ownership as if the true theory, that lakes are susceptible of private ownership, had been applied; but an additional right, which under the true theory would not belong to the public, was declared by the opinion—that is, the right of the public to navigate it. Also, as stated, it is declared that the lake cannot be drained. This latter proposition was placed on the ground that persons who own

property bordering on the lake had rights of navigability in respect thereto. As stated, I am of the opinion that that case has become a rule of property as to this particular property, and for the reasons given the State cannot complain, and the defendant is not complaining, and, indeed, could not, it seems, because it bought the property on the faith of that decision, and therefore in subordination to the rights therein declared.

It is urged in behalf of the State, in view of the annual catch of fish, which is very large, and of the great number of ducks and geese annually killed on the lake, that this body of water should belong to the State, for the pleasure and profit of all of its citizens who may desire to resort thither. To this I agree. The State should buy it from the owners by private purchase, or, failing in that, should condemn it and pay for it, just as it obtains any other private property which it needs. But inasmuch as this property, under the principles of law which I have discussed, is capable of private ownership and was sold, part of it by the State of North Carolina more than 100 years ago, and the rest of it more than sixty years ago, to private persons under whom defendants claim and hold the title, it is not just that the State should retake it without paying therefor a value ascertained by contract or proper adjudication.

For the reasons stated, I am of the opinion that the bill should be dismissed at the cost of the State.